Matthew B. Cox
Register No. 40171-018
Federal Correctional Complex
P.O. Box 1031
Coleman, FL 33521

FILED by _P6_ D.C.

JUN 2 5 2018

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA

INCARCERATED ENTERTAINMENT, LLC,
a Florida Limited Liability Corp.,
and EFRAIM DIVEROLI, an individual,

        Plaintiffs,

   v.

MATTHEW BEVAN COX, an individual,

        Defendant.

_____

MATTHEW BEVAN COX, an individual,

        Counter-Plaintiff,

   v.

INCARCERATED ENTERTAINMENT, LLC;
WARNER BROS. PICTURES, a division
of WB STUDIO ENTERPRISES, INC;
EFRAIM DIVEROLI; and the ESTATE
OF ROSS REBACK,

        Counter-defendants.

_____

CASE NUMBER: 18-cv-21991 SCOLA

DEFENDANT MATTHEW COX'S COUNTER-
COMPLAINT AGAINST PLAINTIFFS AND
SEPARATE COMPLAINT AGAINST WARNER
BROS. PICTURES AND THE ESTATE OF
ROSS REBACK

JURY TRIAL DEMANDED

Without waiving any of his defenses, Defendant and counter-plaintiff Matthew Cox respectfully alleges the following counterclaims against Plaintiffs and Counter-defendants Incarcerated Entertainment LLC, and Efraim Diveroli. Mr. Cox hereby files an eleven-count Counter-complaint against Incarcerated Entertainment LLC, Efraim Diveroli, and the Estate of Ross Reback (all three of the Incarcerated Entertainment principals are collectively referred to herein as the "Incarcerated Defendants").

In conjunction with his claims against the Incarcerated Defendants, Mr. Cox hereby files a four-count complaint against Warner Bros. Pictures, a division of WB Studio Enterprises, Inc., (Warner Bros. Pictures is referred to as "Warner" herein).

Finally, Mr. Cox alleges that the Incarcerated Defendants and Warner have conspired to deprive him of his property and, in furtherance of their scheme, entered a dismissal of the related Middle District of Florida action designed to foreclose Mr. Cox's rights.

In support of the sixteen counterclaims and causes of action asserted by Mr. Cox herein, Cox alleges the following:

<u>OVERVIEW OF THE CASE</u>

1.   In 2016 Warner Bros. released the movie "War Dogs," a dark comedy based on the widely reported story of two young Miami men who secured a $300 million U.S. Defense Department Contract to supply arms to the Afghan Army.  Incarcerated Entertainment was formed by one of the arms dealers portrayed in the movie, Efraim Diveroli, and his business partner, Ross Reback, to monetize Diveroli's life story.  To that end, Incarcerated Entertainment self-published Diveroli's memoir titled: "Once A Gun Runner ... The Real Story" (referred to as "Gun Runner" herein).

2. Counter-Plaintiff Cox is a published author.  He has written five books, one of which is a true crime/memoir published by Skyhorse Publishing titled: "Generation Oxy: From High School Wrestlers to Pain Pill Kingpins." Mr. Cox also authored the "Gun Runner" memoir (as well as the 2013 Manuscript from which it is derived).  He is credited as a co-author on the cover of the book.  Mr. Cox has also written over twelve true crime synopses.  Ownership of the copyright for the "Gun Runner" manuscript is at the heart of the dispute between Cox and the Incarcearted Defendants.

3. Mr. Cox is a federal prisoner.  He selects the subject-matter for his writing from among the prisoner population at the Federal Correctional Complex in Coleman, Florida.  For Generation Oxy, Mr. Cox selected Douglas Dodd as his subject.  Mr. Dodd is a convicted drug dealer who was incarcerated for distributing Oxycodone, among other opiods.  For Gun Runner, Mr. Cox selected Efraim Diveroli as his subject.  Diveroli is a convicted fraudster who was incarcerated for criminal fraud relating to his highly-publicized arms-trafficking activities during the Afghan and Iraq wars. (See <u>Diveroli v. U.S.</u>, 803 F.3d 1258, 1260 (11th Cir. 2014).)

4. Mr. Cox wrote the Gun Runner manuscript in 2013 after extensively interviewing Diveroli and marshalling the events into a cohesive narrative to tell the story while also portraying Diveroli in a more sympathetic light. Mr. Cox contends that the Incarcerated Defendants conspired to steal his copyright to the Gun Runner manuscript and that Diveroli and Reback breached every material representation made to induce Cox to author the manuscript.  Mr. Cox, who is listed as a co-author on the cover of GUn Runner, is the books author and rights holder.

2.

5. With respect to the Incarcerated Defendants, this is an action concerning the rights, credits and renumeration owed Mr. Cox for Gun Runner, which was derived from the Manuscript Cox authored detailing the story the book is based on.  Mr. Cox contends that he is the book's author and rights holder and that the Incarcerated Defendants fraudulently obtained the copyright and breached agreements with him.

6. Warner Bros. Pictures ("Warner") has grossed more than $100 million by marketing and promotiing the movie War Dogs as the "true" story of how Efraim Diveroli tried to hustle his way to the "American Dream" by becoming an international arms dealer fulfilling contracts from the United States Government during the Iraq and Afghan wars.

7. In reality, War Dogs is itself the hustle -- a knowingly false portrayal of Diveroli's real story that has been misleadingly sold to consumers as the unadulterated truth, because Warner knows that audiences are drawn to true stories.  As a result, Mr. Cox, who is the rightful owner of the copyright to the Gun Runner memoir has been unfairly and unlwfully deprived of his ability to compete in the marketplace.

8. This action seeks to hold the Incarcerated Defendants accountable for their unjust and fraudulent conduct.  Mr. Cox is the rightful owner of the Gun Runner copyright and alleges claims of copyright infringement, fraudulent copyright, declaratory judgment of copyright ownership, fraud on the Copyright Office, fraud in the inducement, breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation and conviction.  Cox seeks to be fully compensated for the substantial losses he has suffered and will continue to suffer as a result of the Incarcerated Defendants' conduct.

9. This action seeks to hold Warner accountable for its public deception and unfair competition, prevent it from being unjustly enriched, and to fully compensate Mr. Cox for the substantial losses he has suffered and will continue to suffer in the future as a result of the pervasive misleading advertising campaign behind the War Dogs movie.

## PARTIES, JURISDICTION AND VENUE

10. Counter-Plaintiff Matthew Cox ("Cox"), is an individual who is incarcerated at the Coleman Federal Correctional Complex in Florida.  His Bureau of Prisons Register Number is 40171-018.  Mr. Cox is an author who writes true crime.  He is the rightful owner of the copyright to the Gun Runner manuscript.  He has a release date of January 2019.

11. Counter-Defendant, Efraim Diveroli ("Diveroli") is a convicted fraudster who resides in Dade County, Florida.  Mr. Cox authored the Gun Runner manuscript while both he and Diveroli were incarcerated at FCC Coleman-Low.

12. Counter-Defendant, Ross Reback ("Reback"), was Mr. Cox's former literary agent.  Cox introduced Reback to Diveroli while Diveroli was incarcerated at FCC Coleman-Low.  Thereafter, Diveroli and Reback formed Incarcerated Entertainment, LLC.  Upon information and belief, Reback passed away in August of 2017.

13. Counter-Defendant, Incarcerated Entertainment ("IE"), is a limited liability company formed under the laws of the State of Florida, located in Tarpon Springs, Florida.  IE is a Tampa-area company focused on monetizing Diveroli's story.

4.

14. Counter-Defendant, Warner Bros. Pictures ("Warner") is a corporation formed and organized under the laws of Delaware located at 4000 Warner Blvd., Burbank, california.  Upon information and belief, Warner is a wholly owned subsidiary of Warner Bros. Entertainment whose focus is the creation, writing, production and distribution of motion pictures.  Upon further information and belief, Warner co-produced the movie War Dogs and was the distribution company for the motion picture.  Upon additional information and belief, Warner primarily oversaw, controlled, and managed the creation of the story-line, screenplay, and all related permissions involving War Dogs.  Based upon information available via the U.S. Copyright Office ("Copyright Office"), Warner is a co-owner of the copyright and related movie rights to the film War Dogs.

15. Warner regularly conducts business in the State of Florida and this Judicial District, have committed the acts complained of herein in the State of Florida, and otherwise have sufficient contacts to meet the jurisdictional requirements under the laws of Florida and the United States.

16. Such minimum contacts have included the marketing of and advertising of War Dogs in this Judicial District, the distribution of copies of War Dogs for purposes of display in the Miami area movie theaters, and the operation and conduct of substantial and not isolated business activities within the State of Florida,

17. Based on the foregoing, Warner Bros. Pictures is subject to personal jurisdiction of this court in accordance with the Florida Long-Arm statute and Due Process.

5.

18. This action arises under the Copyright Laws of the United States (17 U.S.C. § 101 et seq.)  Accordingly, this court has federal subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.  This court also has jurisdiction over the subject matter of this suit pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332 & 1338.  This action involves federal questions concerning unfair competition law, parties residing in different states, and claims that exceed the sum or value of $75,000, exclusive of interests and costs.  Finally, this court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

19. Venue properly lies with this district pursuant to 28 U.S.C. § 1391.

## NOTICE OF PRO SE PLEADING

20. Please take notice that Mr. Cox is a layman at law.  Therefore, this court is required to hold Cox's pleadings to a less stringent standard than pleadings drafted by lawyers.  Erickson v. Pardus, 551 U.S. 89 (2007); Haines v. Kerner, 404 U.S. 519 (1972); United States v. Vizar, 956 F.2d 230, 232 (11th Cir. 1991).

## NOTICE OF RELATED ACTION IN THE MIDDLE DISTRICT OF FLORIDA AND COX'S ATTEMPT TO INTERVENE IN THAT LAWSUIT

21. Please take notice that the Incarcerated Defendants have previously filed a lawsuit against Warner asserting four causes of action under the Lanham Act and for false advertising.  (See Dkt. 78, Amended Complaint ("FAC"), Incarcerated Entertainment, LLC. v. Warner Bros. Pictures, No. 8:16-cv-1302 (M.D. Fla.)(Nov. 2016).  That lawsuit was dismissed after Warner settled with the Incarcerated Defendants before the court ruled on Mr. Cox's motion to

intervene.  Where necessary, Mr. Cox identifies the paragraph number for the related case docket filing he relies on for the purposes of establishing a good faith basis for his beliefs, his understandings and the allegations set forth herein.

22. IE's lawsuit arose out of Warner's movie "War Dogs."  IE filed its Original Complaint in 2016 before the film's release.  IE accused Warner and eight others of a convoluted conspiracy to steal secrets from Diveroli's memoir and improperly using Diveroli's name and likeness in the movie War Dogs.  (See id., Complaint (Dkt. 1) at ¶¶ 77-84, 88-89, 101.)  Warner moved to dimiss (Dkt. 40) and rather than oppose, IE hired new counsel and filed an "Amended" complaint in late 2016 (Dkt. 78), dismissing all defendants but Warner, dropping all of IE's original causes of action, and accusing Warner of falsely advertising War Dogs as a true story.

23. The amended complaint's gravamen is that in marketing War Dogs, Warner sold the film as the "unadulterated truth" and as Diveroli's life story. (See FAC (Dkt. 78) at ¶2.)  IE's amended complaint alleged that Warner grossed more than $85 million by portraying War Dogs as Diveroli's "true story" when it was not the true story.  IE alleged that Warner's promotions were misleading and that it false advertising campaign hurt its ability to market the Gun Runner memoir.  IE claimed it had been effectively shut out of the marketplace because consumers are more likely to purchase a ticket to War Dogs than to purchase the memoir. (Dkt. 78 at ¶¶ 3, 72, 75)

24.  In December, 2016 Warner moved to have IE's amended complaint dismissed on grounds that IE had failed to state a claim. (Dkt. 89.) Notably, Warner conceded that it promoted its film "War Dogs" as a "true story" when

it knew all along that the movie was a "fictionalized account" of the events. (Dkt. 89 at pp. 2, 7 and 12)

25.  In March 2017, Mr. Cox moved to intervene in the Middle District of Florida lawsuit pursuant to Rule 24 of the Federal Rules of Civil Procedure and 17 U.S.C. § 501(b).  (See Motion to Intervene (Dkt. 106); Intervenor's Complaint (Dkt. 106-1).)  Mr. Cox did so after he learned that IE had filed an "Amended" complaint alleging entirely new false advertising claims after dropping all of its original causes of action, which Cox knew to be false and improperly manufactured by IE's principals for the purpose of extracting an unjust and unwarranted monetary settlement from Warner.

26.  Mr. Cox, who is listed as a co-author on the cover of Gun Runner, identified himself as the book's author and rights holder.  (See Intervenor's Complaint (Dkt. 106-1) at ¶¶ 2-3).  Mr. Cox moved to intervene because he has a copyright ownership interest in the suit.  Cox asserted claims against IE and two individuals (Diveroli and Reback) whom he alleged had conspired to steal his copyright to the manuscript and violate contracts among them related to the "Gun Runner" project.  (Id. at ¶¶ 47, 55, 76 and 79.)

27.  In his proposed Intervenor's-Complaint, Cox claimed ownership of the copyright and asserted nine causes of action against IE including (1) copyright infringement; (2) fraudulent copyright; (3) declaratory judgment of copyright ownership; and (4) fraud on the U.S. Copyright Office. (See Intervenor's Complaint (Dkt. 106-1).)

28.  With respect to Warner, Mr. Cox asserted the same false advertising claims and unfair competition claims that IE had alleged against Warner.  Cox claimed that he, not IE, is the injured party. (See Dkt. 106-1)

29. On May 10, 2017, the Honorable Judge Scriven denied Warner's motion to dismiss. (Dkt 117.) The court rejected Warner's contention that the challenged statements were not actionable because they included protected artistic or political speech under the First Amendment. (Id. at pp. 5-10.) The court also rejected Warner's argument that IE's amended complaint had failed to allege the necessary facts in support of its claims. (Id. at 10-17.)

30. Upon information and belief, Warner settled the lawsuit with IE for a significant and substantial sum. The parties then filed a joint stipulation of dismissal (Dkt. 143), prompting the court to dismiss the action and "terminate" all pending motions including Mr. Cox's motion to intervene which had been pending for nine months.

31. Because Cox claimed an interest in the copyright and had alleged its infringement, he had a right to intervene in the lawsuit. The United States Copyright Act provides that a district court "shall permit the intervention" of any person "claiming an interest in the copyright." 17 U.S.C. § 501(b). Here, the district court did not permit Cox to intervene, despite his having a right to do so. Worse yet, the court sat on Cox's motion for nine months before dismissing the action. Notably, the claims Cox raised were substantial. As succinctly stated by Warner:

> If the Court lets the case proceed with Cox as a party, there are a host of detailed factual claims asserted by Cox against IE, Diveroli and Reback - sounding in copyright, fraud and contract. The claims revolve around a central theme that Cox is legally and factually the sole author and owner of Gun Runner, as a matter of copyright and contract law, given that he alone authored the

2013 manuscript from which the published book
was derived.

<u>See</u> Warner Bros. Pictures Response to Motion to Intervene (Dkt. 110) at p. 3.
<u>See</u> <u>also</u> Warner's Motion for Leave to Depose Matthew Cox (Dkt. 122) at p. 2
("Given these allegations" by Cox, Warner "believes" that "Cox is a relevant
witness in this case.")

32.   Construing the factual allegations in Cox's Middle District of
Florida complaint as true, Cox established a prima facie case for copyright
infringement by alleging that he is the rightful owner of the Gun Runner
copyright and that IE intentionally and willfully infringed on his copyright
by publishing the work.  Thus, the Middle District of Florida should have
permitted Cox to intervene under Rule 24 and 17 U.S.C. § 501(b).  In response
to the civil action IE and Diveroli have initiated against Cox in the
Southern District of Florida, Cox reasserts the same causes of action that
Warner Bros. had previously characterized as "detailed factual claims" which
sound in "copyright, fraud and contract."

<u>NOTICE OF FILING OF PHYSICAL BOOK</u>

33.   Please take notice that a physical copy of the Gun Runner memoir
has been presented to the Middle District of Florida in the related action.
<u>See</u> The Warner Defendants' Motion for Leave to File Physical Book (Dkt. 44).
Further, Mr. Cox requests that this Court take notice of the fact that he
("Matthew Cox") is credited as a co-author on the cover of the book.  Cox
will present this Court with a physical copy of the book after service is
complete.

<u>NOTICE OF REGISTRATION OF COPYRIGHT</u>

34. Courts have held that because a copyrighted work is a mandatory precondition to suit, the court may consider sua sponte whether a plaintiff has met this requirement.  <u>Marc Anthony Builders, Inc., v. Jarvic Properties</u>, No. 8:11-cv-00432-EAK, 2011 U.S. Dist. LEXIS 74706, 2011 WL 2709882 at *2 (M.D. Fla. July 12, 2011)(finding that a court should consider registration of the work even though defendant did not raise the specific issue).  Here, Mr. Cox has satisfied this precondition.

35. Please take notice that Mr. Cox has filed a copyright application with respect to the Gun Runner memoir he authored.  The Copyright Office has assigned it a registration number of 1-4413333041.

36. Further, it should be noted that Mr. Cox disputes the validity of the copyright obtained by the Incarcerated Entertainment defendants.  Cox contends that the registration pertaining to the Gun Runner memoir (TXU001985899) and (TXU001911676) were obtained on the basis of applications containing material misrepresentations and omissions, thus invalidating the fraudulently obtained copyrights.

<u>FACTUAL ALLEGATIONS</u>

**Matthew Cox Becomes a Writer.**

37. Matthew Cox is a published author.  He writes true crime.  He also writes memoirs.  Mr. Cox has authored five books, one of which ("Generation Oxy" has been published by Skyhorse Publishing.  Cox has also authored the Gun Runner memoir.  In addition to the books he's written, Cox has also

11.

written over twelve true crime synopsis, one of which was the subject of a 2015 feature article in Rolling Stone magazine titled: "The Dukes of Oxy."

38. Mr. Cox is a federal prisoner (No. 40171-018). He selects the subjects for his stories from among the prisoner population at the Coleman Federal Correctional Complex in Florida where he is imprisoned.

39. By way of background, Mr. Cox was arrested in 2006 on federal charges arising out of a large-scale mortgage fraud operation. (See United States v. Matthew Cox, No. 1:05-cr-00546 (N.D. Ga.).) In 2007 Cox pleaded guilty to bank fraud, identity theft and passport fraud. He was sentenced to a 316 month term of imprisonment. As part of Cox's rehabilitation efforts, he participated in a series of programs designed to educate the mortgage industry about mortgage fraud and sophisticated identity theft. At the behest of the government, Cox, from prison, participated in filming episodes for television news programs such as "Dateline" and CNBC programming. Also, at the behest of the government, Cox cooperated in the preparation of articles about mortgage fraud which were published in media and industry publications. Finally, at the behest of the government, Cox agreed to assist the government to develop a course to assist the FBI and industry regulators detect and prevent fraud. To that end, Cox authored an Ethics and Fraud course on behalf of the National Mortgage Originator School, which is used to this day as part of the continuing education requirement to train the nation's mortgage brokers.

40. As a result of the foregoing cooperation, the district court reduced Cox's sentence from 316 months to 234 months. Thereafter, in 2017, the court

ordered Cox's sentence reduced from 234 to 175 months.  Cox now has a projected release date of January 2019.

41.    During the period of Cox's cooperation between 2007 and 2009, he discovered that he had a passion for writing, for marshalling together facts, and for telling a good story.  In 2010, after he had written the "Ethics and Fraud" course, Cox authored his first true crime synopsis.  He selected the circumstances and events regarding his own criminal conduct as the subject for his story.  Afterwards, in 2011, Cox expanded upon the story told in his synopsis into a full length memoir titled:"Shark in the Housing Pool: On the Run With the Secret Service's Most Wanted."

**Diveroli Convicted Fraudster.**

42.    At the age of 18, Diveroli started a small business specializing in arms, ammunition trading, and bidding on U.S. Government defense contracts.  By 2007, Diveroli's company, AEY, Inc., outbid established defense contractors Northrop Grumman and Lockheed Martin and was awarded a $298 million contract to supply arms and ammunition to support the United States' war effort in Afghanistan.

43.    In March 2008, the U.S. Government suspended AEY Inc.'s contracts based on allegations that the company had violated pre-existing arms embargos.  At age 22, Diveroli was indicted by a federal grand jury in Miami based upon fraud charges in connection with his arms trafficking activities.  Ultimately, Diveroli accepted a four-year deal and pleaded guilty.

43.   During his incarceration, Diveroli was contacted by New York bigraphical author Guy Lawson ("Lawson") regarding an interest in writing an article about Diveroli's story. (See Complaint, <u>Incarcerated Entertainment v. Warner Bros.</u>, No. 8:16-cv-01203-MSS-AAS (M.D. Fla.)(Dkt. 1) at ¶ 27; FAC (Dkt. 78) at ¶ 19.)

44.   Lawson, whose background is actually as a lawyer, had previously helped write The Brotherhoods: the True Story of Two Cops Who Murdered for the Mafia with New York Police Department Officer William Oldham -- which is Oldham's biographical account of how his partner Stephen Caracappa (along with another police officer) became turncoats to assist underworld mob bosses, and Oldham became a special investigator to assist the U.S. Attorney in the investigation.  Through Oldham's biographical account, Lawson published the book in 2007.  In April 2013, it was announced that Lawson and Oldham had sold Oldham's life rights (as well as both co-authors' movie rights) to Warner to make a forthcoming feature film. (Dkt. 78 at ¶ 20).

45.   Upon information and belief, in or about early 2011, after Diveroli's sentencing he was again contacted by Lawson. (Id. at ¶ 21.)  According to IE's original complaint, Lawson participated in a jailhouse telephonic interview with Diveroli and explained his past success in writing biographical accounts of larger-than-life stories (including of Mr. Oldham's story and that book's success).  Lawson represented that he could likely get the story published in Rolling Stone magazine and that if there was traction with the article it could turn into a book that he suggested both Lawson and Diveroli would co-author. Ultimately, Diveroli trusted Lawson and agreed to and gave Lawson telephone interviews while incarcerated at Coleman. (Dkt. 78 at ¶ 21.)

14.

46. On March 16, 2011, Rolling Stone published The Stoner Arms Dealers: How Two American Kids Became Big-Time Weapons Traders (the "Rolling Stone Article"). The Rolling Stone Article featured accounts of both Diveroli and that of his business partner (Packhouz).

47. Almost immediately thereafter, but without Diveroli's knowledge, Todd Phillips ("Phillips") reached out to Lawson about writing a screenplay and possibly directing a motion picture regarding Lawson's story. (Dkt. 78 at ¶ 23.) Throughout the June and July 2011 timeframe, Phillips finalized negotiations with Lawson to option the rights for the Rolling Stone Article and any and all associated movie rights (including any related content, materials, stories, and copyrightable works). Optioning articles was becoming big business in Hollywood, because it is an inexpensive way to produce "True" life motion pictures that audiences crave. Id.

47. After reaching an agreement with Lawson, Phillips (through his production company) moved forward with developing a movie portraying Diveroli's story through a production deal with the Warner Defendants. In August, 2011, Warner recorded the written assignment of Lawson's rights to the Rolling Stone Article. The August 22nd filing with the Copyright Office denoted a written "Option Agreement" which was executed by Lawson on July 20, 2011 which assigned rights to the Warner Defendants (hereinafter the "Option Agreement"). Id. at ¶ 24.

48. In late 2011, having just assigned these movie rights, but without telling Diveroli about the agreements he had already reached with Phillips and Warner, Lawson again contacted Diveroli about co-authorship of a book (akin to

15.

what Lawson had written with Oldham).   Lawson engendered Diveroli's trust by telling him that he wanted Diveroli's story to be told, and for the public to know the truth about how Diveroli ended up in prison. (Id. at ¶ 25).   Through various emails, Lawson continued to solicit information from Diveroli through the first half of 2012, while continuing to represent that he was researching the book to be co-authored by both of them.   It was Diveroli's belief and understanding during that timeframe that, upon his release from prison, Lawson and Diveroli would write Diveroli's biographical account (akin to what Lawson had written with Oldham).

**Reback Enters Into the Picture.**

50.   In late 2011, Ross Reback ("Reback"), a successful business man reached out to Cox while he was in prison.   Reback led Cox to believe he had a background in the Entertainment Industry and indicated an interest in Cox's story.   Ultimately, Cox and Reback had a meeting at FCC Coleman where Reback indicated an interest in publishing Cox's memoir:  "Shark in the Housing Pool."

51.   Cox and Reback entered into a literary agent/co-author agreement in early 2012.   Pursuant to the agreement, Cox and Reback would split 50/50, all receipts generated from book sales, the sale of movie and associated rights, etc.   Also, pursuant to the agreement, Reback was responsible for getting Cox's memoir published.   Reback was also responsible for pitching the story in Hollywood for the purpose of selling the film rights.   The agreement also provided that Reback would reimburse all the expenses Cox incurred to produce and electronically transmit the manuscript (e.g. email credits purchased from Cox's commissary account).   The agreement also obligated Reback to reimburse all of the expenses that Cox incurred to communicate with Reback (e.g., telephone

credits, email credits, postage, etc.)  Finally, the agreement obligated Reback to provide Cox with accounting statements and to keep Cox fully informed of all significant developments pertaining to the publishing, marketing and sales relating to his memoir.

52.  After he entered into the literary agent/co-author agreement with Reback, Cox finalized the manuscript and electronically transmitted it to Reback via the FCC Coleman email system the Federal Bureau of Prisons ("BOP") makes available to qualified inmates.  Thereafter, Cox and Reback began editing the manuscript so that Reback could pitch it to publishers and film produces.

**Cox Authors the Gun Runner Manuscript.**

53.  After completing his memoir, Cox began a search (from among the Coleman prisoner population) for any interesting stories that he could develop into another book.  This is when Cox become acquainted with Diveroli, then a prisoner at FCC Coleman serving his sentence.

54.  In early 2012 Cox introduced himself to Diveroli, who was then in prison for criminal fraud relating to his highly publicized arms trafficking activity.  Diveroli was a "high profile" prisoner on account of his highly publicized case which included, among other media accounts, Lawson's 2011 Rolling Stone Article.  (See Diveroli, 803 F.3d at 1260 (stating that "Efraim Diveroli's story is so outlandish that it has inspired an article in Rolling Stone, a book, and a forthcoming comedy film."))  Cox spoke with Diveroli about his case and suggested he write a memoir.  Diveroli indicated that he could never write a book because he suffered from ADHD and a biopolar condition and

17.

that because of his medical conditions he wouldn't be able to maintain focus long enough to write a story.

55.  Thereafter, Cox discussed with Reback his idea about developing Diveroli's story into a book.  Reback expressed an interest in working with Cox to get Diveroli to publish a memoir with them.  Reback encouraged Cox to continue developing a relationship with Diveroli and agreed that Cox should put Diveroli in contact with Reback so that he could explain the importance of getting Diveroli's version of the events published.

56.  While Cox and Reback were editing the "Shark In the Housing Pool" manuscript, Cox and Diveroli continued having discussions about writing a memoir, but without Diveroli telling Cox that he already had an "agreement"" or "understanding" with Lawson or harbored any "belief" that he and Lawson had plans to collaborate on a book. (Dkt. 1 at ¶ 23)  Diveroli had even written to Lawson to confirm that Lawson was not authorized to provide any factual details, written expressions, or content associated with the story rights and/or movie rights to Diveroli's story.  In response, Lawson confirmed that he would not do "anything with [Diveroli's] consent, of course ... as [Lawson's] intentions [were] good." (Id. at ¶ 35).

57.  Without telling Cox that he already had an agreement with Lawson to collaborate on a book, Diveroli continually expressed his disappointment with Lawson's Rolling Stone Article which he claimed had characterized him as a "greedy prick."  It was Cox who told Diveroli that the only way for the public to know the truth about his exploits would be for Diveroli to write a memoir telling the real story.  Cox told Diveroli that he was interested in pursuing

the project.

58.     Cox continued having conversations with Diveroli of this nature. Although Diveroli indicated an interest, he kept putting Cox off by claiming he was too busy dealing with his attorneys and their challenges to his conviction.

59.     Sometime in mid-2012, Diveroli told Cox that RatPac Entertainment/Warner Bros. had optioned the movie rights to Lawson's Rolling Stone Article. Diveroli indicated that he was conflicted about this development. On the one hand, he was excited that a movie was being made about him. On the other, however, he was irritated by the way he had been portrayed in the Article. Diveroli indicated that he would like to sit down with Cox to discuss writing an outline to his story after some papers were filed in connection with his habeas action.

60.     It was during this conversation that Cox, once again, emphasized how important it was to get his version of the events on paper. Cox pointed out that RatPac Entertainment was the same production that had produced the "Hangover" movies and that they were going to make a joke out of Diveroli's life. Cox told Diveroli that the film would end up being named something like "Dude, Where's My Hand Grenade?" and that Diveroli's name would become synonymous with the Jeff Spicoli character from "Fast Time at Ridgemont High." Cox also pointed out that Diveroli wouldn't be getting paid any money from the film because the movie would be based on Lawson's Rolling Stone Article. Cox explained that the only way Diveroli could monetize his story would be to write his own memoir.

61.  Diveroli met with Cox after he had filed his reply to the government's response to his 2255 motion.  Diveroli told Cox that Lawson had told him that he was expanding his Rolling Stone Article into a full length book about Diveroli's exploits.  Cox specifically asked Diveroli why had he been  in contact with a reporter about his criminal case.  Diveroli indicated that he was only talking to Lawson to set the record straight.  Diveroli was of the blief that Lawson couldn't use any of the information he obtained from Diveroli without his permission.  Cox told Diveroli that he was wrong; that any information Diveroli voluntarily provided to a reporter could be published without his consent.

62.  In the autumn of 2012, Cox and Diveroli began to work on a timeline/outline of Diveroli's story, chronicling Diveroli's version of events. As compensation for the outline, Diveroli and Cox entered into a verbal agreement where Cox would receive 1% of Diveroli's life right, and a one-time payment of $500.00.  Under this agreement, Diveroli was also obligated to reimburse Cox for all of the expenses he incurred to produce the outline (e.g., email credits purchased from Cox's commissary account).  Cox met with Diveroli four to five times a week, over the course of a six week period.  Each of their sessions lasted about two hours.  After identifying all of the pertinent events, Cox formulated those facts into an outline chronicling the story.

63.  Meanwhile, Cox and Reback finished editing Cox's memoir ("Shark In the Housing Pool").  Thereafter, in early 2013, Cox allowed Diveroli to read the complete manuscript.  Within a few days of receiving the manuscript Diveroli finished reading it.  Diveroli was enthusiastic in his praise of Cox's writing style, claiming it was one of the best books he had ever read.  Diveroli told Cox that he was an amazing author and that he wanted Cox to write his memoir.

Diveroli told Cox that they would be "partners," and would collaborate to coauthor the manuscript. Diveroli also told Cox that he would supply him with the necessary biographical information and promised full access to all the legal materials he had amassed in connection with his criminal case. Under the agreement Diveroli proposed, Cox would be responsible for writing the manuscript after marshalling the events into a cohesive story.

64. Cox declined Diveroli's offer. He did so because, although Diveroli claimed they would be "partners" in the venture, Cox's share of the property would only be 10% ownership stake. Nothwithstanding Cox's rejection, Diveroli continued to pursue the ideas of having Cox author the manuscript. During these conversations Diveroli would emphasize that there had been national media attention for his case; that if Cox wrote the manuscript it would get published by a major publishing house; that the film rights were certain to be sold; and that he (Cox) would receive professional recognition as a author. Diveroli repeatedly assured Cox that he would make at least $50,000 for writing the manuscript, in addition to what they were going to make from the sale of the film rights.

65. In early 2013 Cox began writing the manuscript, which he provisionally titled "Once A Gun Runner, Always A Gun Runner." Cox did so after he had entered into a co-authorship agreement with Diveroli. Pursuant to their agreement, Cox would receive a 10% ownership stake, including an ownership interest in the copyright. Under the agreement Cox would receive 10% of the gross from book sales, consistent with Cox's 10% onwership stake. Also, under this agreement, Cox would receive an additional 5% of the gross from the sale of the film rights. Finally, under the agreement, Cox was to receive authorship credit,

21.

with Diveroli promising that Cox's name and biography would be on the book. In addition, the agreement obligated Diveroli to (1) zealously publicize the book to increase sales and (2) reimburse Cox for the expenses he incurred in connection with producing and electronically transmitting the manuscript (e.g., telephone calls, email credits, postage, et cetera).

66. It was on the basis of these representations that Cox was induced to enter into a partnership agreement with Diveroli in early 2013. It was Cox's understanding and good-faith belief that he and Diveroli were partners; that Cox had a 10% ownership stake in the venture (and an ownership interest in the copyright); that Cox was to receive 10% of the gross from book sales and an additional 5% of the gross from the sale of the film rights.

67. Diveroli, however entered into this agreement with Cox without telling him that he had already entered into an earlier agreement with Lawson to co-author a book telling Diveroli's story. (See Complaint (Dkt. 1) at ¶ 34; FAC (Dkt. 78) at ¶ 27 (alleging that Diveroli was assisting Lawson conduct research for the "book to be co-authored by [the] both of them.")

68. Cox spent hundreds of hours researching and writing the Gun Runner manuscript between January and July 2013 (there are dozens of emails accessible from Cox's prisoner email account to independently corroborate Cox's claim. It should be noted that Cox produced the manuscript utilizing the BOP's inmate email system, all of which are time and date stamped and retrievable for review.) During this same timeframe, Cox oversaw and directed the research efforts undertaken by Diveroli's sister (Abigail) and Ross Reback on Cox's behalf, so that Cox could more fully develop Diveroli's account into a cohesive

and interesting story. (There are dozens of retrievable emails between Cox and Abigail Diveroli, as well as between Cox and Reback which independently corroborate Cox's account that he oversaw and directed the research for the manuscript.)

[Notably, the FAC (Dkt. 78) filed by Incarcerated Entertainment is saturated with false and misleading contentions.  For example, at ¶ 29, IE claims that Diveroli had "expanded his original 2012 manuscript into a full draft" of the memoir "between November, 2013 and June 2014."  IE's claim is false.  Cox wrote the Gun Runner manuscript between January and July 2013.  He electronically transmitted the completed manuscript to Reback months before IE claims Diveroli began writing the manuscript in November.  IE concocted this easily provable lie in order to conform its version of the events to the false factual narrative IE initially fabricated in support of the fraudulent claims Diveroli and Reback had manufactured against Warner and alleged in its original complaint.]

69.  As demonstration of Diveroli's good faith, he agreed to hire Cox's then-literary agent (Ross Reback) to be his agent.  Thereafter, Cox introduced Diveroli to Reback during visitation at FCC Coleman-Low.  Cox participated in two of the meetings between Diveroli and Reback.  Cox was present when Diveroli and Reback discussed entering into an agreement regarding the Gun Runner project.  He was also present during their discussion about forming a company ("Incarcerated Entertainment") to hold the intellectual property created by the manuscript Cox was writing.  Cox was told by both Diveroli and Reback that Cox's agreement with Diveroli would be incorporated into the corporation; thus making Cox a partner in the venture as well.

70.   There was, however, one concern.   Cox was present during a conversation between Diveroli and Reback where they discussed the possibility of manufacturing a bogus lawsuit against Warner in the event Reback was unable to sell the film rights to Diveroli's story.   Reback and Diveroli were both aware that Warner had already optioned the film rights to the Rolling Stone Article that Lawson had written.   Diveroli explained to Reback and Cox that he had shared some biographical and factual information with Lawson.   Cox was present while Diveroli and Reback explored how they could capitalize on Warner's having purchased an option from Lawson by manufacturing a fraudulent claim that Warner had stolen elements from Diveroli's story in order to extract an unjust and unwarranted money settlement under the false pretense that Warner had stolen Diveroli's life story.

71.   Indeed, according to Diveroli, he had a cousin in Los Angeles who knew people in the Entertainment Industry who Diveroli could use to set a trap in order to manipulate a Warner surrogate into taking possession of the Gun Runner manuscript so that Reback could falsely claim that Warner had stolen elements from the manuscript to produce the Implicated Movie.   The stated purpose of the sham lawsuit was to extort an unjust and unwarranted monetary settlement from Warner.

72.   Cox made his objections clear to both Diveroli and Reback.   Cox told them that he could not be a party to any agreement to manufacture a fraudulent lawsuit.   Diveroli and Reback assured Cox that their discussions were merely a hypothetical exercise; an exploration of an alternative course of action available in the event Reback was not sucessful in getting the manuscript published or selling the film rights.   Cox was told to focus on completing the

manuscript which Cox genuinely believed was commercially viable on its own without having to resort to any fraudulent activity.

73. Diveroli, however, remained excited by the prospect of fabricating a fraudulent claim against Warner. Whenever Diveroli would raise the issue of manufacturing a sham lawsuit Cox would tell him to drop the subject. It was Cox's stated belief that the Gun Runner project could be a commercial success and that his focus was on writing a great book, not ginning up a bogus lawsuit.

74. Diveroli was later transferred from FCC Coleman to the federal prison in Miami, Florida. At the time of Diveroli's transfer, Cox had already completed writing two-thirds of the Gun Runner manuscript. Cox finished writing the manuscript that summer (2013) without any additional input from Diveroli by expanding upon the earlier outline Cox had created.

75. After completing the Gun Runner manuscript Cox electronically transmitted it to Reback via the "Tru-Lincs" email system the BOP makes available to all qualified inmates. Cox and Reback collaborated to edit the manuscript so that Reback could begin pitching it to publishers and film producers. The editing process was completed in about a six week period. (There are dozens of emails and recorded phone calls between Cox and Reback that are easily retrievable from the BOP. These communications constitute objectively verifiable evidence that independently corroborate Cox's account.)

76. After Cox completed editing the Gun Runner manuscript, Reback failed to promptly pitch it to publishers and film producers, as Reback and Diveroli had previously represented to Cox. When pressed for an explanation for the

delays, Reback told Cox that pitching the Gun Runner project was on hold until the federal district court ruled on Diveroli's 28 U.S.C. § 2255 motion. Cox objected to the unwarranted, noncommercial related delays in pitching the Gun Runner manuscript which, Cox contends, amounts to breach of the agreement (see ¶¶ 63-64 supra) he had entered into with Diveroli and Reback.

77. Upon information and belief, Reback began pitching the Gun Runner manuscript after Diveroli's § 2255 motion was denied. According to Reback, he pitched the manuscript to Randhom House. Reback told Cox that Random House had indicated an interest. Ultimately, however, Randhom House rejected the project after learning that Simon & Schuster was getting ready to release Lawson's book about Diveroli's exploits. The unwarranted and non-commercially related delays in pitching the Gun Runner manuscript cost Cox a publishing deal with Random House and amount to a breach of the agreement he had entered into with Diveroli and Reback.

78. Upon information and belief, Reback pitched the Gun Runner manuscript to Universal Pictures and to Warner Bros. Pictures. According to Reback, Universal indicated an interest in making a Netflix-type series based on the manuscript. Ultimately, however, Universal rejected the project after learning that Warner had "green-lighted" the making of a film based on the Rolling Stone Article and Lawson's book regarding Diveroli's exploits. The unwarranted and non-commercially related delays in pitching the Gun Runner manuscript cost Cox a deal with Universal and amounted to a breach of the agreement he had entered into with Diveroli and Reback.

79. According to Reback, his inability to market the Gun Runner manuscript stemmed from two related issues. First Lawson's version of Diveroli's exploits

had become an accepted version of events in Hollywood and throughout the publishing industry. Second, as indicated below, because of unwarranted delays in pitching the manuscript on account of Diveroli, the window of opportunity to achieve commercial success with the Gun Runner project had lapsed.

[ These were also the principal reasons Reback later gave to Cox for why he and Diveroli were proceeding with their (fraudulent) lawsuit against Warner. In fact during one of their conversations about the anticipated lawsuit, Reback excitedly told Cox that he and Diveroli had managed to manipulate the son of the president of Warner Bros. into taking possession of the Gun Runner manuscript under the terms of a confidentiality agreement, thus providing IE with a factual basis to claim how Warner had stolen elements of Diveroli's story for use in the Implicated Movie. Indeed, during one of their conversations Reback feigned that he was shocked that "Shimmy" had failed to tell them that his father was Warner's president. Reback had forgotten that -- months earlier -- he made statements to Cox indicating that he knew who Shimmy's father was before Shimmy had ever been provided with access to the Gun Runner manuscript.]

80.  Following Diveroli's release from federal prison, he did not get (and has not gotten) in contact with Cox despite his repeated promises to do so. Nor has Diveroli made good on any of the material representations he made to induce Cox to author the Gun Runner manuscript. Indeed, Reback took it upon himself to reimburse Cox for the expense he incurred for producing and electronically transmitting the Gun Runner manuscript.

27.

81.  Further delaying the pitching of the Gun Runner manuscript was certain bad-faith actions on Diveroli's behalf.  Diveroli attempted to market the manuscript behind Reback's and Cox's back.  Upon information and belief, Reback discovered that Diveroli had tried to sell the manuscript's rights to the production company that had produced the film "Cocaine Cowboys."  Upon further information and belief, Diveroli only resumed contact with Reback after his bad-faith efforts to rip-off Reback and Cox had failed.

82.  Cox learned of Diveroli's bad-faith actions from Reback.  Thereafter, Cox sent Reback a letter to forward to Diveroli whom, as indicated, had unilaterally (and in bad faith) terminated all contact with Cox.  Cox wrote Diveroli a heartfelt letter in an attempt to shame Diveroli into making good on the representations he had made.  Cox reminded Diveroli that he (Cox) had been the motivating factor behind the Gun Runner project and that, but for Cox, the manuscript would not have been written.  According to Reback, he forwarded the letter to Diveroli.  And, according to Reback, the letter had the desired effect on Diveroli in that he renewed his commitment to make the project a commercial success.

83.  In late 2014, Cox learned from Reback that he and Diveroli had decided to get the Gun Runner professionally edited.  According to Reback, this was merely a pretext to ingratiate himself with the editor ("Nathan") whom, according to Reback, had contacts with Regan Arts that he (Reback) and Diveroli wanted to take advantage of.

84.  In February 2015, Cox sent Reback a letter to forward to Diveroli. See Ex. A : Letter to Efraim Diveroli from Matthew Cox (Feb. 1, 2015).  Cox

voiced his frustration to Diveroli and Reback and told them that "[s]uing Warner Bros. ... isn't going to work; they haven't done anything wrong and you're not going to be able to get them to not ... produce their version of the story." Id. at ¶ 4. Cox clearly indicated his belief that Diveroli and Reback had wasted valuable time focusing their efforts on manufacturing a bogus lawsuit against Warner. (Please note that Cox voiced these concerns more than fourteen months before IE filed its fraudulent original complaint against the Warner Defendants.) Cox also made it clear to Diveroli that:

> I didn't sign up to NOT have your memoir published. I wrote a damn good manuscript and I believe in the story. Publish it and push it. Its your only real option. Stop fucking around and get to work on the opportunity you have sitting in front of you. Its the fastest, best solution; and if its done right, it'll fix all the problems that WAITING to pitch the project caused.

Id. at ¶ 11 (emphasis in original).


85. Sometime after Mother's Day 2015, Reback told Cox that he pitched the Gun Runner project to Regan Arts who, according to Reback, loved the manuscript. Upon information and belief, Regan Arts ultimately rejected the project after learning from Simon & Schuster that Lawson's book about Diveroli's exploits ("Arms and the Dudes") was not selling.


86. Cox learned of Regan Arts decision from Reback. Thereafter, Reback informed Cox that he and Diveroli had decided to e-publish the Gun Runner manuscript and were focusing all of their attention on their contemplated lawsuit against Warner. Cox, in December 2015, expressed to Reback his anger and disappointment over how the project had been handled. In his letter, Cox told Reback that "all I can think about is what a mistake I made convincing Diveroli to write a memoir." Cox expressed his anger over the unwarranted and noncommercially related delays in pitching the manuscript and his anger over Diveroli and Reback spending so much of their time focusing on their bogus

29.

lawsuit against Warner.

87.   The above exchange between Cox and Reback resulted in Reback becoming enraged with Cox and rupturing their relationship.  (As indicated, there are numerous emails and recorded phone calls between Cox and Reback with the Bureau of Prisons electronically stored in the normal course of business which are available to independently corroborate Cox's accounts of these events.)

88.   On March 24, 2016, Warner launched the movie trailer for War Dogs and began its advertising campaign.

89.   The copyright registration Diveroli obtained is invalid because Diveroli concealed highly pertinent information from the U.S. Copyright Office. For instance, Diveroli obtained the copyright without describing Cox's participation in and rights to the work.  Diveroli did so not only to conceal Cox's participation in and his rights to the work, but also to omit mentioning Cox because he had expressly made it clear to Diveroli and Reback that he would not be a party to any fraudulent lawsuit alleging manufactured claims against Warner or participate in any fraudulent scheme to extort a monetary settlement from Warner under false pretenses.

90.   The copyright registration Diveroli obtained is invalid because he did not disclose to the Copyright Office that he was obtaining the Gun Runner copyright for the purpose of bringing a fraudulent lawsuit that he and his business partner (Reback) had improperly manufactured against Warner and related persons and entities.  Diveroli's representations and omissions were deliberate and made for the purpose of concealing not only Cox's co-author and partner

status in the venture, but also for the purpose of supporting Diveroli's and Reback's baseless claim that Warner had stolen secrets from Diveroli's memoir.

91.  Had the Copyright Office known that Diveroli had sought a copyright of the Gun Runner manuscript for the purpose of bringing a fraudulent lawsuit against Warner that Diveroli and Reback had manufactured in bad faith, the Copyright Office would not have granted Diveroli a copyright for the work.

92.  On April 28, 2016, Incarcerated Entertainment ("IE") filed a complaint against seven Warner Bros defendants alleging four causes of action.  IE's complaint accused Warner and eight others of a convoluted conspiracy to steal secrets from Diveroli's memoir and improperly use Diveroli's name in the movie. (See Complaint (Dkt. 1) at ¶¶ 77-84, 88-89, 101.)  IE alleged that Warner conspired with a business associate of Diveroli's and Reback's to steal Diveroli's story and misappropriated his personality rights to produce the Implicated Film.  At its core, IE alleged that Warner unlawfully used IE's intellectual property to produce the motion picture War Dogs.

93.  Cox and Reback were in contact shortly before and after IE filed its original complaint.  Cox did not join -- nor did he ask to join -- the lawsuit because he knew that the claims IE alleged were not only false but had been manufactured by Diveroli and Reback who utilized Diveroli's cousin in Los Angeles to further their fraudulent scheme by manipulating the son of Warner's president into taking possession of the Gun Runner manuscript.

94.  During this timeframe Reback also told Cox about an offer by CNN to produce a documentary about Diveroli and the Gun Runner memoir.  The offer by CNN included an offer to advertise and promote the book.  Reback also told Cox

about other national media interest in the book including, inter alia, offers by the New York Times and USA Today to promote the memoir in exchange for Diveroli participating in full length profiles.

95.    Reback indicated that neither he nor Diveroli were interested in pursuing the foregoing opportunities because they were fully committed to pursuing their lawsuit against Warner which as, indicated, Cox knew alleged false claims that had been manufactured. Cox objected to Reback regarding IE's strategy.  Specifically, IE's failure to capitalize on these opportunities to promote and publicize the book. Cox pleaded with Reback to take advantage of these opportunities. Cox indicated his concern that IE's lawsuit against Warner had become a complete distraction. He objected to the fact that IE, Diveroli and Reback were not capitalizing on Diveroli's notoriety and national media interest in the Gun Runner memoir, which Cox believed was invaluable.

96.    Cox also took issue with Diveroli's failure to zealously promote and publicize the book because this had been a material factor that Diveroli had agreed to in order to induce Cox to author the manuscript and agree to less than a 50/50 split in the venture because Diveroli had promised to capitalize on the national media fascination with his exploits to not only publicize the book, but also Cox himself as an author. (Indeed, without that specific representation Cox would not have agreed to less than a 50/50 split or the Gun Runner manuscript would not have been written.)

97.    Also, during this timeframe, Reback told Cox that CNN had indicated

32.

an interest in producing a segement profiling Cox and how he had re-invented himself as an author while in federal prison.  According to Reback, he could not take advantage of this opportunity to promote Cox's career as an author because him and Diveroli were preoccupied with the Warner lawsuit.

98.  During this period, Cox received a hardcover copy of the Gun Runner memoir that IE had self-published.  Upon reviewing the book, Cox discovered that Diveroli had falsely claimed that he had personally written the book.  Also, Cox discovered that, despite Diveroli's earlier representation, the book did not contain a photo of Cox or his biographical information on the inside of the book's back cover.

99.  Warner moved to have IE's complaint dismissed. (Dkt. 37.)  Thereafter, Cox spoke with Reback who expressed his dismay that the movie War Dogs as a fictionalized account of the events that strayed so far from the truth that IE would not be able to credibly maintain that Warner had solen elements of Diveroli's story.  Essentially, Reback acknowledged that IE's efforts to manufacture a bogus lawsuit were for naught as the film had only a passing resemblance to the truth.  Rather than oppose Warner's complaint, IE  hired new counsel and -- five months later -- filed an amended complaint, dismissing all defendants but Warner, dropping all of IE's original causes of action, and accusing Warner of falsely advertising War Dogs as the "unadulterated truth" and Diveroli's life story. (Dkt. 78 at ¶ 2).  Neither Diveroli or Reback apprised Cox of the filing of the FAC or that IE had abandoned its fraudulent claims that Cox knew Diveroli and Reback had manufactured and which IE (in bad faith) had pursued against Warner in its original complaint.

100.  The FAC's gravamen is that in marketing War Dogs, Warner sold the film as "the 'true story' of []Efraim Diveroli" and as the "unadulterated truth." After learning about the filing of the Amended Complaint from a friend, Cox obtained a copy of the filing and discovered that -- unlink its earlier fraudulent claims IE had pursued -- the claims IE asserted in its Amended Complaint were sound, i.e., that Warner's multi-million dollar promotional campaign for War Dogs was misleading and hurt Cox's ability to market the "Gun Runner" memoir to publishers, film produces, and the book-purchasing public.

101.  Cox prepared an Intervenor-Complaint and moved to intervene in the lawsuit after learning that IE had abandoned its fraudulent claims against Warner.  He did so because he is the rightful owner of the Gun Runner manuscript and he believes that there are elements of IE's then newly asserted claims against Warner which were are meritorious.  Cox moved to intervene in the lawsuit because his ability to market the Gun Runner manuscript has been prejudicially damaged and because his rights and interests were not being protected.

102.  Both Diveroli and Reback have failed to make good on every material representation they made to induce Cox to enter into the business relationship with them.  Cox, in good faith, relied on those representations to his detriment.  But for Diveroli's and Reback's false and misleading representations, Cox would not have entered into the Gun Runner business relationship nor would he have authored the manuscript.  The only reason why Cox agreed to less than a 50/50 split was because of Diveroli's false representations that he would capitalize on the national media attention in his exploits to promptly promote and publicize the Gun Runner manuscript once Cox

had completed writing the manuscript.  This consideration was material because Cox believed that publicity of that nature was invaluable and would have established his professional credibility as an author.  But for Diveroli's false promises and assurances regarding this issue, Cox would not have agreed to anything less than a 50/50 split in the venture.  Had Diveroli not agreed to those terms, Cox would not have authored the Gun Runner manuscript.

103.  Cox had not been kept apprised of the fact that IE had filed an amended complaint alleging non-fabricated claims that materially impact the rights, credit and revenue that Cox is due.  Nor has Cox received any accounting statement of the gross revenues generated by the Gun Runner venture.  Nor has Cox received any of the revenue owed him.

104.  In February 2017, Cox filed with the U.S. Copyright Office a copyright application for the Gun Runner manuscript that he authored.

### THE FALSE ADVERTISING OF WAR DOGS

105.  In March 2017 Cox sued Warner for false advertising and related claims because Warner has and is promoting its movie  "War Dogs" as the true story of Diveroli's exploits, when it has conceded that its film is largely a work of fiction.  (Dkt. 89 at ¶¶ 2-3, 7, 12).  Ultimately, as shown, Warner knew that War Dogs is not a true depiction of Diveroli's story, contrary to what its advertising, marketing and promotion of the film has led the public to believe. As a result, Cox, as the rightful owner of the Gun Runner copyright, has been unfairly and unlawfully deprived of his ability to compete in the marketplace.

35.

106. Cox brings this suit against Warner to hold it accountable for its public deception and unfair competition, to prevent it from being unjustly enriched, and to fully compensate Cox for the substantial losses he has suffered and will continue to suffer in the future as a result of the pervasive misleading advertising campaign behind the movie War Dogs. To establish his claims, Cox describes Warner's misconduct in great detail, identifying Warner's false promotional materials, quotes several of Warner associates that War Dogs is true and alleges that these statements mislead consumers about the content of the movie. The misconduct alleged herein fully supports Cox's contention that Warner's false advertising campaign has caused damage to Cox, the rightful owner of the Gun Runner copyright.

**Reback Pitches the Gun Runner Manuscript**

107. Upon information and belief, Reback, in May 2014, prepared a detailed list of producers and motion picture studios that he believed would have interest in the movie rights associated with Diveroli's life story. That list included multiple people and entities, including Todd Phillips (the director of War Dogs), Brett Ratner (who is associated with RatPac-Dune Entertainment, a Warner affiliated-entity), and Warner itself, who was ultimately responsible for the War Dogs movie. (Dkt. 78 at ¶ 31.)

108. On June 13, 2014, Reback sent a formal letter to Mr. Ratner in Beverly Hills, which detailed how Reback was partners with Diveroli and interested in meeting with Ratner to address the life story rights, film rights, publishing rights, and other ancillary rights available regarding Diveroli's story.

36.

Likewise, on June 19, 2014, Reback circulated a similar letter to Todd Phillips at Warner in which Reback explained Incarcerated's interest in addressing the life rights, film rights, publishing rights, and other ancillary rights available regarding Diveroli's story. (Id. at ¶ 33.)  Reback noted his understanding that Phillips was working on a "project currently in development based on this subject" and suggested "it would be in our mutual best interest to set up a meeting to discuss as soon as possible" regarding Diveroli's "completed, not yet published memoir" (i.e., the 2013 Manuscript that Cox authored).

109.   On July 8, 2014, Elena Reyter, Associate General Counsel for Warner Bros. responded to Incarcerated's June 19, 2014 correspondence regarding Efraim Diveroli. (Id. at ¶ 34)  Ms. Reyter confirmed that Warner's legal team as well as its senior business affairs executive were "discussing the matter of [Reback's] letter internally ... and hop to get back to [Reback] shortly."

110.   On September 3, 2014, Reback received an email on behalf of Ms. Reyter at Warner stating that Warner "have decided not to pursue a consulting arrangement at this point in time" with Incarcerated. (Id. at ¶ 35.)

111.   Between March 2011 and July 2014, Warner made no effort to contact Reback or Incarcerated either directly or indirectly, and made no effort to contact either Diveroli or Cox, both of whom were in prison. Moreover, Warner made no effort to investigate or verify the accuracy of the film it was creating.

**Guy Lawson, Packouz, and Warner Bros.,' Access to the Truth**

37.

112.   While Warner was writing, filming and editing War Dogs, Diveroli made himself available to provide a true and accurate account of his story. (Id. at ¶ 38.)   Likewise, Cox had indicated to Reback that he was available to speak with Warner's writers concerning Diveroli's exploits.

113.   Warner also had other resources available to obtain truthful information Diveroli's and AEY's rise-and-fall.

114.   While promoting War Dogs, Warner even touted its access to individuals who knew Diveroli's true story.   In fact, as described below, Warner bombarded the public with its professed intention to tell the "true story." (Id. at ¶ 39.)

115.   During the five-month period spanning September 2014 and March 2015, Phillips (along with the assistance of Jason Smilovec and Stephen Chin) prepared a re-write of the War Dogs script. (Id. at ¶ 41.)

116.   Lawson had also engaged in substantial research and investigative journalism to expand his Rolling Stone article into a book titled Arms and the Dudes. (Id. at ¶ 42.)

117.   Warner also retained Packouz to act as a consultant on the movie. (Id. at ¶ 43.)

118.   Warner later emphasized the "truth" of War Dogs to the public by highlighting the retention of Packouz as a consultant and Lawson as a producer — two people the public equates to knowing Diveroli's true story. (Id. at ¶ 44.)

119.   In their capacity as agents of Warner, both Lawson and Packouz had actual knowledge that War Dogs is not a "true story." (id. at ¶ 45.)

120.   Thus, even though Warner purposefully avoided obtaining the truth from Diveroli or Cox, Warner still had access to a substantial amount of material to tell an accurate story.   Certainly, Warner had knowledge of sufficient information to realize that its portrayal of Diveroli in War Dogs was not true or the real story. (Id. at ¶ 46.)

121.   Nevertheless, throughout filming, Warner still did not ask to speak with or interview Diveroli or Cox to verify the accuracy of Jonah Hill's portrayal of Diveroli or the story itself. (Id. at ¶ 47.)

122.   Despite having multiple avenues available to have portrayed an actual "true" story, Warner decided to make a fictional movie which it then marketed and promoted as "true" in order to make more money. (Id. at ¶ 48.)

**The False Advertising of War Dogs.**

123.   On June 9, 2015 Simon & Schuster, a division of CBS Corporation, published Arms and the Dudes. The book would later become yet another marketing tool for Warner to proclaim the truth of its story by linking the movie to a piece of investigative journalism. (Id. at ¶ 49.)   Originally the Implicated Movie was slated for release into movie theaters for May 11, 2016 under the name Arms and the Dudes.   However, the release date for the Implicated Movie was ultimately moved back to August 19, 2016 and renamed War Dogs.

124.   Beginning in March 2016, Warner engaged in a media blitz to promote War Dogs as a "true story." As part of their contractually obligated marketing for the movie, Todd Phillips, Jonah Hill, Miles Teller, and Bradley Cooper appeared on dozens of television and radio shows and gave numerous interviews to the press. (Id. at ¶ 50.)

125.   On March 24, 2016, Warner launched the movie trailer for War Dogs at http://devour.com/video/war-dogs-trailer/ as well as on You Tube at https://www.youtube.com/watch?v=Rwh9c_E3dJk. Since its release on You Tube, the trailer, found at https://www.youtube.com/watch?v=KWs5qnZnhfo, has been viewed more than 5.5 million times. (Id. at ¶ 51.)

126.   The same day the first trailer was release, Warner also launched its Facebook page at https://www.facebook.com/WarDogsMovie/?fref=ts. To date, the Facebook page has nearly 2,000,000 followers. On or about March 28, 2016, Warner also launched the movie's website. (Id. at ¶ 52.)

127.   In addition to representing to consumers that War Dogs is true, the trailers feature Diveroli's real name.



128.   In various advertising and marketing of War Dogs -- including in a March 25, 2016 Rolling Stone article -- Warner also used actual pictures of Diveroli to promote the film:

 

Todd Phillips' *War Dogs* follows two 20-something Miami Beach stoners (_ _ _ and Miles Teller) who land a $300 million deal with the U.S. government to arm the Afghan military during the Iraq War. The plot sounds implausible, but is based on a true story documented by Guy Lawson in a _ _ _ _ _ _ _ _ (and his subsequent 2015 book _ _ _ _ _ _). The film's hilarious trailer outlines the basic plot, hinting at the decadence and danger awaiting the unlikely businessmen.

**SIDEBAR**

The Stoner Arms Dealers: How Two American Kids Became Big Time Weapons Traders »

The clip opens with Hill and Teller securing their massive bid at the Pentagon in February 2007 before cutting to the partners relishing their lavish lifestyle and cruising around in fancy cars. "They call guys like us war dogs: bottom-feeders who make money off of war without ever stepping foot on the battlefield," says a voiceover. "It was meant to be derogatory, but we kind of liked it."

129.   On March 29, 2016, Lawson, while acting as an agent of Warner, announced the War Dogs movie is inspired by his Arms and the Dues book:



Check out the book that inspired the movie--I wrote it.



_ _ _ _

Arms and the Dudes: How Three Stoners from Mi _ _ _

130.  Throughout its extensive advertising and marketing efforts, Warner has not only promoted its film as being a factually accurate portrayal of Diveroli's exploits, but as a feature of their promotion lifted the term "An American Dream" from the prologue of the 2013 Manuscript that Cox wrote: "American dream becomes an American nightmare: -- which is clearly illustrated by the movie poster for the film:



131.  Far from limiting its promotion of War Dogs as being a dramatized version of reality and merely "based" on a true story, Warner continuously promoted, and continues to promote, the movie as the true story of real life events and real people. (Id. at ¶ 57.) Worse yet, Warner unleashed its agent (Packouz) to publicly disparage the accuracy of the book Cox had written telling Diveroli's story.  Packouz, while acting as an agent of Warner, publicly declared that the "War Dogs" movie was very near the truth while Diveroli's book ("Gun Runner") "is a work of fiction."  See Ex. B: Elfink, Miami New Times (Aug 18-26, 2016) at p. 13.

132.   Nearly all of the marketing materials and interviews about the movie emphasizes the fact that this story actually happened, underscoring Warner's chief marketing mantra -- Go see War Dogs because its a true story. (Id. at ¶ 58.)

133.   On multiple occasions, Miles Teller (who plays the role of Packouz) told interviewers that "these are real people," and that Packouz and Diveroli are "real guys who are still alive." (Id. at ¶ 59.)

134.   On May 12, 2016, Lawson described War Dogs as "amazingly close to the real truth of the story." (Id. at ¶ 60.)



135.   Adding further confusion, Lawson changed the name of Arms and the Dues to War Dogs in June, 2016, changed the cover of the book to the War Dogs poster and proclaimed that his book told "the true story."   The War Dogs book, in

capitalizing on the overall promotion of the movie, has become an Amazon.com best seller:



136.  In August, 2016, War Dogs screenwriter Stephen Chin added to Warner's misleading promotion of the film:

> I think more than many studio writers, I'm very interested in finding the real story.  You talked about the journalistic thing.  When you come to something that's a true story.  First of all, you have that responsibility. I was motivated to do this in large measure because I  saw  these  guys, Efraim and David, as a real way to tell an accessible story -- as a way into the story about the war, about the economics of war, about the gigantic military industrial business that rose up around the war.  So I wanted to be deeply true to their story.  I was also very interested in the procedural.  I thought audiences would be really interested.  How does

somebody who's a 19 year-old kid, not just work the internet and get the contract, how does he actually pull it off? (Emphasis added)

137.  Packouz even described the movie as being "exactly how it happened:"





138.  On September 1, 2016, Warner used its own social media to entice the public to go see War Dogs by inviting them to "meet the history of Efraim Diveroli and David Packouz."



Warner Bros. Pictures Argentina
new photos

You can get to do anything for money. Meet the history of efraim diveroli and David Packouz in *amigosdearmas*, the new comedy from the creators of what happened yesterday? Starring Jonah hill and miles teller. In Cinemas!



139.  Thereafter, on September 8, 2016, Phillips promoted War Dogs by stating that "truth is stranger than fiction," and it was really the reality, the idea that it was a true story that appealed to me," and "we certainly tried to follow what happened as closely as possible I think.  If you know the story at all, we pretty much stick to the facts as much as we can."

46.

140.    Phillips further emphasized the truth of the movie during his promotional tour by stating:

> Well, you know its based on a true story so its a little bit about making sure you're servicing this story, and its one of those things where truth is truly stranger than fiction.  And so we got this article, this Rolling Stone article like Bradley was saying and it was about doing service to this really intense, wild story.  And some of its comedy ... some of its drama ... but its really about playing to the truth of it. (Emphasis added)

141.    Jonah Hill, during his promotion of the film, removed any doubt as to Warner's decision to market War Dogs as a completely true portrayal by describing the film as "just a story that's so crazy you can't believe it actually happened" and "one of the craziest movies I've ever been in -- in a great way.  And it's all true. (Emphasis added).

142.    Warner placed a substantial importance on representing War Dogs as a true story to the public because it knew that such representations induce consumers to go see movies.  In fact, Phillips even stated that "the idea that this was a true story was for me the most interesting part about it."

143.    Similarly, Miles Teller recognized that "I love the words 'based on a true story' at the beginning of a film ... it buys you so much with an audience."

144.    In another interview, Phillips relayed the results of test screening the movie, which involved surveying real consumers about their opinions about the film, by stating: "I think one of the things that really attracts people to

it when we test screen the movie, what did you like about the movie, I think one of the main things is that it was based on a real story."

145.  Stated simply, Warner knew it would make more money by marketing War Dogs as a true story instead of the work of fiction that it actually is.

146.  And, even now after the film is no longer shown in movie theaters, Warner has continued to market and promote War Dogs as a true story, despite knowing the film is largely a work of fiction.  For example, Exhibit C hereto is an advertisement for War Dogs appearing on Amazon.com, promoting the film as a "true story" for sale to home consumers.  Warner expressly promotes the film as a "true story of two young me ..."  Warner also makes the same false statements in its advertising campaign with various video streaming services –– as reflected in Exhibit D (Verizon.com) Exhibit E (Comcast.com) and Exhibit F (Indemand.com).

147.  Again, Warner knows it will make more money distributing the film to home viewers by marketing War Dogs as a true story instead of the work of fiction that it actually is.

**War Dogs Impeded Cox's Ability to Compete**

148.  Prior to releasing the film, Warner saturated the market with statements that War Dogs told the "true story" of Diveroli which, combined with the celebrity of Jonah Hill, Bradley Cooper and Todd Phillips, and Warner's resources, enabled it to essentially shut Cox out of the competitive

48.

marketplace. (Dkt. 78 at ¶ 72.)  And, now that the film is no longer being shown in movie theaters, Warner has continued saturating the home viewing market with false statements about War Dogs being a "true story," further shutting Cox out of the competitive marketplace.

149.   Several Hollywood based groups who had expressed interest in the Gun Runner Manuscript Cox authored have declined to move forward due to the Warner launch of War Dogs. (Id. at ¶ 73.)

150.   A google search of "true story of War Dogs" results in the official Warner trailer and numerous links to articles about the "crazy" and "unimaginable" true story supposedly told by the movie. (Id. at ¶ 74.)

151.   Accordingly, consumers who desire to learn the true story are most likely to purchase a ticket to the movie or pay to have it stream online, after being bombarded with promotion material, rather than purchasing the Gun Runner book that Cox authored.  (Id. at ¶ 75.)

152.   War Dogs opened in theaters in the United States on August 19, 2016. Later that year War Dogs become available for purchase on direct to home viewing by consumers. (Id. at ¶ 76.)

153.   Any reasonable consumer would believe based on Warner's advertising and marketing campaigns that War Dogs intended to and depicted the real-life Diveroli, and not a fictional character engaged in made-up behavior. (Id. at ¶ 77.)

154.   In reality, the movie centers upon a false portrayal of Diveroli and includes scenes depicting events that never occurred. (Id. at ¶ 78.)

155.   Warner's promotion of its retention of Packouz, his cameo appearance in the movie, and its commission of the Rolling Stone article, combined with the use of Packouz's and Diveroli's real names in the movie and the re-naming of the War Dogs book, create the false implication that Warner is privy to facts about Diveroli's real-life story that are unknown to the general public and create the impression that Warner checked its sources to ensure the truth of the movie. (Id. at ¶ 80.)

156.   This is particularly true with regard to the War Dogs scene during which Diveroli tears up a written agreement to avoid paying Packouz for services performed.   A reasonable viewer would believe, given Packouz's involvement with the film and Warner's trumpeting the "true story," that Diveroli and Packouz actually had a written agreement and that Diveroli is an unethical business-person who cheats his partners out of their hard-earned pay.   (It should be noted that Diveroli admitted to Cox that Packouz had, in fact, been his partner and that Diveroli did cheat him.   What Warner fabricated, however, was its notion that a written contract existed.   Diveroli told Cox there was no written contract.)

157.   Warner knew these scenes were false.   Even the Rolling Stone article on which the movie is supposedly based clearly states Diveroli and Packouz did not have a written contract. (Id. at ¶ 81.)

158.   Similarly, War Dogs includes a prominent scene in which Diveroli

refuses to pay an Albanian business person AEY hired to repackage ammunition. Again, Warner knew this scene was false. The Rolling Stone article describes how the Albanian mafia cut this man out of the deal -- not Diveroli. (Id. at ¶ 82.)

159. War Dogs also includes scenes, featured in the trailers, in which Diveroli engages in exceedingly reckless and deadly behavior. In War Dogs, Diveroli fires a machine gun in public and later drives himself and others through the "Triangle of Death" to deliver a load of guns, while being fired upon by two truckloads of combatants. Warner knew that these scenes were false and never occurred; the latter being admittedly based on an incident supposedly experienced by one of the screenwriters, rather than by Diveroli. (Id. at ¶ 83.)

160. Warner also placed Packouz in integral roles involving false implications, thereby creating the impression that the scenes enjoyed the imprimatur of Packouz. (Id. at ¶ 84.)

161. Packouz, as Warner's agent, perpetuated the false and misleading perception that Warner hired him to ensure the truth of the movie by appearing on numerous media outlets to promote the movie and emphasize the truth of the story. Packouz even stated that he was "actually very pleasantly surprised by how accurate the overall arc of the story and many of the small details were." (Id. at ¶ 86.)

162. Similarly, Lawson knew that the movie, including the depiction of Diveroli, is false. At a minimum, Lawson's actual knowledge, which must be imputed to Warner given his role as a producer, gave rise to an obvious need for

51.

Warner to investigate and verify the truthfulness of the movie that Warner was telling the public was "true." (Id. at ¶ 86.)  And, we now know, that Warner had since admitted (Dkt. 89 at 2-3, 7 and 12) that it knew all along that War Dogs is a fictional account, notwithstanding Warner's public claims to the contrary.

163.  Ultimately, Warner knew, directly or through its agents, that War Dogs is not a true depiction of Diveroli's story, contrary to what its advertising, marketing and promotion of the film led the public to believe.

164.  On May 10, 2017, the Hon. Judge Scriven made a very significant ruling in the related case.  See Ex. G: Order (Dkt. 117.)  The court rejected Warner's defense that the First Amendment bars claims of the nature that Cox has alleged herein. Id.  Likewise, the court held that claims of the nature Cox alleges herein against Warner have been sufficiently pleaded to create an issue of fact under the Rogers balancing test. Id.  Finally, the court accepted Warner's concession that its film War Dogs is, in fact, a work of fiction which Warner had promoted as a true story. Id.

165.  Ultimately, as shown, Warner knew that War Dogs is not a true depiction of Diveroli's story, contrary to what its advertising, marketing and promotion of the film led the public to believe.  As a result, Cox, the owner of the Gun Runner copyright has been unfairly prejudiced and unfairly deprived of his ability to compete in the marketplace.

166.  All conditions precedent to the filing of this Complaint have been satisfied, have occurred, or have been waived.

## FIRST CAUSE OF ACTION

### (Declaratory of Judgment of Copyright Ownership)

167.  Cox incorporates by reference and alleges paragraphs 1 through 166 as set forth herein.

168.  Cox owns the copyright to the Gun Runner manuscript.  He authored the manuscript in 2013.

169.  A real and justiciable controversy exists between Cox and IE as to who owns the copyright to the "Gun Runner" manuscript.

170.  Cox seeks a declaratory judgment from this Court which declares that the copyright for the Gun Runner manuscript is owned by Cox within the meaning of the Copyright Act, 17 U.S.C. § 101 et. seq.

## SECOND CAUSE OF ACTION

### (Copyright Infringement)

171.  Cox incorporates by reference and alleges paragraphs 1 through 166 as set forth herein.

172.  Cox owns the copyright to the Gun Runner manuscript.  He authored the manuscript between January and July of 2013.

173.  The Incarcerated Entertainment Defendants have intentionally and willfully infringed on Cox's copyright by publishing the Gun Runner memoir which was based on the 2013 manuscript Cox authored.

174.  As a direct and proximate result thereof, Cox has been injured, in an amount presently unknown and to be determined at time of trial, by reason of the Incarcerated Entertainment Defendants and intentional acts.

175.  Cox is entitled to costs pursuant to 17 U.S.C. § 505.

176.  The injury Cox has suffered and continues to suffer unless IE's acts of infringement are enjoined is irreparable.

177.  Cox has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### (Fraud on the Copyright Office)

178.  Cox incorporates by reference and alleges paragraph 1 through 166 as set forth herein.

179.  Diveroli submitted an application to the Copyright Office without disclosing Cox's participation in and rights to the work.  Diveroli omitted from the application Cox's status as a partner in the venture and ownership interest in the copyright.  Rather than apprise the Copyright Office of these facts, Diveroli made representations that were untrue, materially inaccurate or misleading.  Furthermore, the Diveroli falsely claimed that he wrote the Gun Runner manuscript.  He also falsely claimed that he completed writing the manuscript in 2014, and that he produced the manuscript between November 2013 and February 2014.  Diveroli intentionally made these materially false and

misleading representations for the purpose of concealing Cox's participation in and rights to the work when, in fact, Diveroli knew that Cox had written the manuscript and had done so between January and July of 2013.

180. Moreover, Diveroli committed a fraud on the Copyright office by omitting material facts from the application he submitted. Diveroli concealed from the Copyright Office the fact that he intended on using the copyrighted Gun Runner manuscript as a factual predicate in support of the fraudulent lawsuit that Diveroli and Reback had improperly colluded to manufacture against Warner. Diveroli also failed to apprise the Copyright Office that he was seeking to obtain the copyright to Gun Runner in order to manufacture standing to bring the fabricated claims IE had alleged against Warner in its original complaint in the related case. Diveroli also failed to apprise the Copyright Office of the fact that he was seeking to obtain the Gun Runner copyright to further the illicit scheme that Diveroli and Reback had hatched, i.e., their plan to manufacture a fraudulent lawsuit against Warner for the purpose of extracting an unwarranted and unjust monetary settlement.

181. As shown, Diveroli and Reback colluded to manufacture the fraudulent causes of action that IE brought against Warner in its original complaint against Warner in the related case. (IE withdrew its fabricated claims after its principals viewed War Dogs and discovered that the movie was a work of fiction and, therefore, that IE's claims that Warner had stolen elements from the Gun Runner manuscript to make the film were baseless.) The Incarcerated Entertainment Defendants manufactured its bogus claims against Warner in order to extract an unwarranted and unjust monetary settlement. Obtaining the copyright to the Gun Runner manuscript was a key element in Reback's and

Diveroli's scheme.  Once Diveroli and Reback were able to manipulate the son of Warner's president ("Shimmy") to take possession of the Gun Runner manuscript, IE had a factual basis to fabricate a case against Warner by falsely claiming that Warner had conspired with others to steal secrets from the Gun Runner manuscript and improperly use them in making its film War Dogs.  (The fact that Warner's film turned out to be a work of fiction is what ultimately led to IE's carefully crafted plan unraveling.)

182.  Obtaining a copyright to the Gun Runner manuscript was material to the Incarcerated Entertainment Defendants being able to move forward with their illicit scheme against Warner, as well as material to manufacturing IE's standing to sue.

183.  Had the Copyright office been apprised of these material facts, Diveroli would have never been issued the copyright. (See: Artworks v. Toy Loft. 684 F.2d 821, 824 (11th Cir. 1982)(holding that a knowing failure to advise of facts which might have resulted in rejection of the application constitutes reason for holding copyright invalid.)

184.  Diveroli intentionally made material omissions in his application to the Copyright Office for the purpose of concealing the fact that he was obtaining the Gun Runner copyright for the purpose of bringing a fraudulent lawsuit against Warner based on manufactured causes of action the Incarcerated Entertainment Defendants had concocted.

185.  As a result of the foregoing misrepresentations and omissions, Diveroli fraudulently obtained the copyright to the Gun Runner manuscript.

Diveroli then transferred the fraudulently obtained copyright to IE as part of the illicit scheme that he and Reback had hatched to manufacture a fraudulent lawsuit against Warner alleging claims they had concocted.

186. As a result of Diveroli's fraud on the Copyright Office, Cox has been deprived of his ownership interest in the copyright. Cox has also lost out on opportunities to market the manuscript's publishing and film rights. Further, Cox was deprived of the opportunity to participate in settlement negotiations with Warner whom, upon information and belief, has paid IE a significant and substantial sum to IE to settle the second lawsuit brought against Warner once it was conclusively shown that the claims IE had alleged in its original complaint were baseless.

187. IE's use of the fraudulently obtained copyright has caused immediate and substantial damages to Cox financially and professionally. The Incarcerated Entertainment Defendants conduct and actions set forth herein are the direct and proximate cause of damages to Cox in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Fraudulent Copyright)

188. Cox incorporates by reference and alleges paragraphs 1 through 166 as set forth herein.

189. Diveroli fraudulently obtained the copyright to the Gun Runner manuscript without disclosing to the Copyright Office Cox's participation in and rights to the work.

190.   Diveroli fraudulently obtained the copyright to the Gun Runner manuscript by omitting from his application that he and Diveroli were using the manuscript to further an illicit scheme to not only manufacture a fabricated factual basis to bring a fraudulent lawsuit against Warner, but also to manufacture standing to bring its original complaint (Dkt. 1) in the related case.

191.   As a result of the fraudulent transfer (without consideration) of the copyright and IE's misappropriation of the copyright, Cox lost independent opportunities to sell the film and publishing rights to Universal, Random House, and Regan Arts.   And, as a result of its fraudulently obtained copyright, IE had obtained an unjust and unwarranted settlement from Warner which rightfully belongs to Cox.

192.   IE's use of the fraudulently obtained copyright has caused substantial financial damage as well as damage to Cox's professional reputation and commercial goodwill.   The Incarcerated Entertainment Defendants conduct and actions set forth herein are the direct and proximate cause of damages to Cox in the amount to be proven at trial.

### FIFTH CAUSE OF ACTION

### (Fraud In the Inducement)

193.   Cox incorporates by reference paragraphs 1 through 166 as if set forth herein.

194.   The agreement that Cox entered into with Diveroli is void because he was induced to enter the agreement by Diveroli's false and materially misleading representations.

195.   Prior to entering into the agreement, Diveroli and Cox agreed to the scope of the venture and how to share the proceeds.  As described, Diveroli made certain representations during the course of negotiating their agreement which were untrue, inaccurate and/or misleading.  Diveroli deceived Cox into believing they were "partners" in the venture; that they had agreed to a co-authorship agreement with Cox having a 10% ownership stake in the venture and an ownership interest in the copyright.

196.   It was Cox's understanding and good-faith belief that he and Diveroli were partners in the venture; had a co-authorship arrangement; and that he (Cox) maintained an ownership in both the venture and the Gun Runner copyright.  Under the agreement, Cox was entitled to 10% of the gross revenue generated from the sale of publishing rights and book sales.  Cox was also entitled to an additional 5% of the gross from the sale of the film rights.

197.   Also, under the agreement, Cox was entitled to an ownership interest in the copyright for co-authoring the manuscript and to have his photograph and biographical information displayed on the inside of the back cover of the book. And, under the agreement, the manuscript was to be promptly pitched to publishers and film produces after Cox had finished editing the manuscript. Also, under the agreement, Diveroli was obligated to capitalize on the national media interest in his case to zealously promote and publicize the Gun Runner

manuscript and Cox's role as co-author.

198. Diveroli knew that the foregoing representations were false and intended to induce Cox to rely on those representations. But for those misrepresentations, Cox would not have written the Gun Runner manuscript.

199. Cox justifiably relied on those representations to his detriment. Because of the fraudulent inducement, the agreement that Cox entered into with Diveroli is void and Cox can reclaim the copyright and sue IE for infringement and other damages. Diveroli's misrepresentations to Cox are the direct and proximate cause of his damages in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

#### (Fraud In the Inducement)

200. Cox incorporates by reference and alleges paragraphs 1 through 166 as if set forth herein.

201. The agreement that Cox entered into with Diveroli is void because he was induced to enter the agreement by Diveroli's false and materially misleading representations.

202. Prior to entering into the agreement, Diveroli and Cox agreed to the scope of the venture and how to share the proceeds. As described, Diveroli made certain representations during the course of negotiating their agreement which were untrue, inaccurate and/or misleading. Diveroli deceived Cox into believing

they were "partners" in the venture; they had agreed to a co-authorship agreement with Cox having a 10% ownership stake in the venture and an ownership interest in the copyright. Also, under the agreement Cox was entitled to an ownership stake in the venture and an ownership interest in the copyright. And, under the agreement, the Gun Runner manuscript was to be promptly pitched to publishers and film producers as soon as Cox had completed editing the manuscript.

203. Diveroli knew the foregoing representations were false and intended to induce Cox to rely on those representations. The agreement that Cox entered into with Diveroli is void because Cox was deceived into writing the manuscript so that Diveroli and Reback could have a factual basis to manufacture a fraudulent lawsuit against Warner.

204. As shown, Diveroli and Reback colluded to manufacture the fraudulent causes of action that IE brought against Warner in its original complaint in the related case. The Incarcerated Entertainment Defendants manufactured its bogus claims against Warner for the purposes of extracting an unwarranted and unjust monetary settlement. Deceiving Cox into writing the Gun Runner manuscript was a key element in Diveroli's and Reback's scheme. Deceiving Cox into writing the manuscript was material to not only the Incarcerated Entertainment Defendants being able to go forward with their scheme against Warner, but also to manufacturing IE's standing to sue.

205. Diveroli knew that the foregoing representations were false and intended to induce Cox to rely on those representations. But for those misrepresentations, Cox would not have written the Gun Runner manuscript.

206. Cox justifiably relied on those representations to his detriment. Because of the fraudulent inducement, the agreement that Cox entered into with Diveroli is void and Cox can reclaim the copyright and sue IE for infringement and other damages. Diveroli's misrepresentations to Cox are the direct and proximate cause of his damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### (Breach of Contract)

207. Cox incorporates by reference and alleges paragraphs 1 through 166 as if set forth herein.

208. As described, Cox entered into a contractual relationship with Diveroli to co-author the "Gun Runner" manuscript. The agreement between the parties is void because IE's and Diveroli's fraudulent misconduct. (See Fifth and Sixth Cause of Action.) If, however, the contract is not void for fraud, the contract should be rescinded because the Incarcerated Entertainment Defendants have materially breached the contract.

209. Cox fully performed his obligations under the agreement by researching and writing the Gun Runner manuscript, and by supervising and participating in the editing process.

210. The Incarcerated Entertainment Defendants breached their obligations under the agreement by failing to account for or distribute to Cox his share of the gross revenue generated by the sale of publishing rights or book sales. They also breached the contract by failing to account for or distribute to Cox

his share of the gross revenue owed from the sale of film related rights.

211.  IE, Diveroli and Reback breached their obligation under the agreement by failing to provide Cox with detailed accounting statements. They also breached the agreement by unilaterally terminating all contact with Cox, notwithstanding their obligation to keep him fully apprised of all significant

developments including, inter alia, the fact that they had abandoned their original complaint against Warner alleging false and manufactured claims and had filed a second complaint against Warner in which Cox had a direct interest.

212.  The actions of Incarcerated Entertainment Defendants constitute material breaches of contract. These breaches of contract entitled Cox to reclaim the copy right and sue IE for infringement and for other damages. These same breaches are the direct and proximate cause of damages to Cox in an mount to be proven at trial.

### EIGHTH CAUSE OF ACTION

### (Breach of Contract)

213.  Cox incorporates by reference and alleges paragraphs 1 through 166 as if set forth herein.

214.  As described, Cox and Diveroli entered into a contractual arrangement to co-author the "Gun Runner" manuscript. This agreement between the parties is void because of the Incarcerated Entertainment Defendants fraudulent misconduct.

63.

Prior to entering into the agreement, Cox and Diveroli agreed to the scope of the venture and how to share the proceeds. Under the agreement, Cox and Diveroli were "partners" in the venuture. And, under the agreement, they had agreed to co-authorship arrangement with Cox having a 10% ownership stake in the venture and an ownership interest in the copyright. Under this agreement, Cox was entitled to 10% of the gross revenue from the sale of publishing rights and book sales. Also, Cox was entitled to an additional 5% of the gross revenue from the sale of film related rights.

215. Also, under the agreement, Diveroli was obligated to capitalize on the national media interest in his criminal case to promote the book in order to (1) generate public and industry interest in the Gun Runner project; and (2) to publicize Cox having re-invented himself as an author. Diveroli had led Cox to believe that as soon as Cox had completed writing the manuscript Diveroli and Reback would promptly begin pitching the manuscript to publishers and film produces.

216. Cox fully performed his obligations under the agreement by researching and writing the manuscript, and by supervising and participating in the editing process.

217. The Incarcerated Entertainment Defendants breached their obligations under the agreement by failing to make good on the foregoing representations. The IE Defendants had breached the agreement by delaying the pitching of the manuscript for non-commercial reasons, to wit: waiting for Diveroli's post conviction attorneys to complete his 28 U.S.C. § 2255 attack upon his conviction.

218.   The Incarcerated Entertainment Defendants dilatory actions during the timeframe material to this cause of action cost Cox (1) an opportunity to sell the Gun Runner publishing rights to Random House; (2) the opportunity to sell the Gun Runner film rights to Universal; and (3) the substantial remuneration Cox would have received from the sale of the film and publishing rights; and (4) the commercial goodwill and professional credibility an author establishes by having a manuscript he wrote published by a major publishing house or adapted into a film project.

219.   Also, Diveroli materially breached his contractual obligations by unilaterally breaking off contact with Reback and Cox for a period in which Diveroli (in bad faith) attempted to sell the film and publishing rights to the Gun Runner manuscript for his own direct remuneration behind Reback's and Cox's back.  Diveroli's bad faith actions during this behind-the-back period cost Cox (1) the opportunity to sell the publishing rights to Regan Arts; (2) the substantial remuneration Cox would have derived from the sale of the manuscript's publishing rights; and (3) the commercial good will and the professional credibility an author establishes by having a manuscript he wrote published by a major publishing house.

220.   The Incarcerated Entertainment Defendants also breached the obligation to capitalize on the national media interest in Diveroli's story to publicize and promote the Gun Runner project in order to generate interest in among publishers, film producers and the book publishing public.  By not capitalizing on the opportunities to publicize and promote the project, Cox was deprived of substantial remuneration and of the opportunity to promote his new career as an author, causing Cox substantial financial and professional damage.

65.

221.   The actions of the Incarcerated Entertainment Defendants constitute material breaches of the contract.  These breaches entitle Cox to reclaim the copyright and sue the Incarcerated Entertainment Defendants for infringement and damages.  The same breaches are the direct and proximate cause of damages to Cox in an amount to be proven at trial.

### NINTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

222.   Cox incorporates by reference and alleges paragraphs 1 through 166 as set forth herein.

223.   As described, Cox and Diveroli entered into an agreement to co-author the Gun Runner manuscript.  Prior to entering into the agreement, Cox and Diveroli agreed to the scope of the venture and how to share the proceeds. Under the agreement, Cox was entitled to 10% of the gross generated from the sale of publishing rights and book sales.  Cox was also entitled to an additional 5% of the gross from the sale of the film rights.

224.   And, under the agreement, Diveroli was obligated to capitalize on the national media interest in his story to publicize and promote the Gun Runner project in order to (1) generate interest among publishers, film producers, and the book purchasing public; and (2) to publicize Cox having reinvented himself as an author while incarcerated.

225.   Cox fully performed his obligations under the agreement by researching and writing the manuscript, and by supervising and participating in the editing

of the manuscript.

226.   The agreement between the parties is void because of fraud in the inducement.  (See Fifth and Sixth Causes of Action.)  If, however, the contract is not void for fraud, the contract should be rescinded because the Incarcerated Entertainment Defendants breached the implied covenant of good faith and fair dealing by intentionally failing to account for or distribute to Cox his share of the gross revenue generated from the sale of publishing rights, film rights, and book sales.

227.   The Incarcerated Entertainment Defendants also breached the implied covenant of good faith and fair dealing by intentionally failing to promptly pitch the manuscript to publishers and film producers after Cox had completed editing the manuscript, as previously agreed.  The IE Defendants breached the implied covenant of good faith and fair dealing by delaying pitching the manuscript for non-commercial reasons, to wit: waiting for Diveroli's post-convictin counsel to complete their 28 U.S.C. § 2255 attack upon Diveroli's conviction.

228.   The Incarcerated Entertainment Defendants also breached the implied covenant of good faith and fair dealing by failing to capitalize on viable commercial opportunities.  The Incarcerated Entertainment Defendants also breached the implied covenant of good faith by electing to focus their efforts on manufacturing the fraudulent lawsuit they brought against Warner in the original complaint in the related case.

67.

229.   The Incarcerated Entertainment Defendants actions during this timeframe cost Cox (1) the opportunity to sell the publishing rights to Random House; (2) the opportunity to sell the film rights to Universal; (3) the substantial remuneration Cox would have derived from the sale of the film and publishing rights; and (4) the commercial goodwill and professional credibility an author establishes by having a manuscript he authored published by a major publishing house or adapted into a screenplay for a movie studio.

230.   Diveroli also breached the implied covenant of good faith and fair dealing by intentionally breaking off contact with Reback and Cox for a period in which he tried to sell the film and publishing rights to the Gun Runner manuscript behind Reback's and Cox's back.

231.   The Incarcerated Entertainment Defendants also breached the implied covenant of good faith and fair dealing by failing to capitalize on the national media interest in Diveroli's story to generate interest in the Gun Runner project among publishers, film producers, and the book publishing public.  By not capitalizing on the substantial opportunities to publicize and promote the project, Cox was deprived of substantial remuneration and of the opportunity to promote his new career as an author, causing Cox substantial damage financially, as well as damage to his professional reputation and commercial goodwill.

232.   These breaches of covenant of good faith and fair dealing by the Incarcerated Entertainment Defendants entitle Cox to reclaim the copyright for the Gun Runner manuscript and to sue the IE Defendants for infringement and other damages.  These same breaches are the direct and proximate cause of damage

to Cox in an amount to be proven at trial.

233.   The Incarcerated Entertainment Defendants conduct and actions as described herein were attended by willful and wanton disregard for the rights of Cox, entitling Cox to punitive damages.

## TENTH CAUSE OF ACTION
### (Breach of Partnership Formation)

234.   Cox incorporates by reference and alleges paragraphs 1 through 166 as if set forth herein.

235.   As described, Cox and Diveroli entered into an agreement to co-author the Gun Runner manuscript.  Prior to entering into the agreement, they agreed to the scope of the venture and how to share the proceeds.  Under the agreement, Cox and Diveroli were partners in the venture, with Cox maintaining a 10% ownership stake in the venture and an ownership interest in the copyright. Under the agreement, Cox was entitled to 10% of the gross revenue generated from the sale of publishing rights and book sales.  Cox was also entitled to an additional 5% of the gross from the sale of film related rights.

236.   The parties memorialized the terms of the venture in writing; and transmitted those terms to Diveroli's counsel.  Diveroli's counsel reduced the terms of the venture to a written agreement.

237.   The formal language in the contract is inconsistent with the label

69.

of the agreement. The label makes it appear that there existed an employee agreement rather than a partnership. That was not the intent of the parties, as indicated by Cox being entitled to a percentage of the gross revenue consistent with his ownership stake. Counsel for Diveroli at Diveroli's instruction unilaterally revised the label of the contract in order to deceive Cox into signing the agreement.

238. The label of the agreement provided a predetermined method by which Diveroli could expropriate the benefits of the venture without having to honor the parties understanding.

239. Diveroli's action as described herein constitute a breach of the partnership formation. Because of this breach, Cox's agreement with Diveroli is void and Cox can reclaim the copyright and sue the Incarcerated Entertainment Defendant for infringement.

240. This breach of partnership formation by Diveroli is the direct and proximate cause of damage to Cox in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### (Conversion)

241. Cox incorporates by reference and alleges paragraphs 1 through 166 as if set forth herein.

242. Cox authored the Gun Runner manuscript.

243.  Cox turned the work over to the Reback and Diveroli, expecting them to comport to the terms of the venture.  Rather than comply with terms, the Incarcerated Entertainment Defendants took Cox's property for their own purpose and used it in a manner contrary to the terms of the venture without benefit to Cox. As a direct and proximate thereof, Cox has been injured, in an amount presently unknown and to be determined at time of trial, by reason of the Incarcerated Entertainment Defendant's intentional acts.

## TWELFTH CAUSE OF ACTION

### (Negligent Misrepresentation)

244.  Cox incorporates by reference and alleges paragraphs 1 through 166 as set forth herein.

245.  As described, Diveroli made certain representations to induce Cox to enter into the agreement that were untrue, inaccurate and/or misleading.

246.  Cox relied on the negligent misrepresentations to his detriment. Diveroli's misrepresentations are the direct and proximate cause of Cox's damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

### (Violation of Section 43(a) of the Lanham Act)

#### (Injunctive Relief)

247.  Cox incorporates by reference and alleges paragraphs 1 through 166 as if set forth herein.

248.   Warner, in connection with the marketing and sale of War Dogs, has made and continues to make false and misleading representations of fact in commercial advertising used in interstate commerce.

249.   Warner's representations described above are false and misleading and deceive or are likely to deceive consumers.

250.   Warner's conduct constitutes false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B).

251.   Warner's representations have caused and are likely to continue causing Cox competitive or commercial injury.

252.   Cox will be irreparably harmed if Warner is not enjoined from advertising or promoting War Dogs as Diveroli's true story.

253.   Cox does not have an adequate remedy at law.

254.   Cox is substantially likely to succeed on the merits of his claims.

255.   Entry of an injunction will serve the public interest and prevent future deception.

WHEREFORE, Plaintiff, Matthew Cox, respectfully requests that the court enter an Order:

72.

(a) permanently enjoining Warner Bros. and all those acting in concert with Warner, including its officers, servants, employees, attorneys, affiliates, subsidiaries, agents or representatives, from advertising or promoting War Dogs as "true;"

(b) requiring Warner Bros. to take corrective action to disabuse the public of the false notion that War Dogs is a true story; and

(c) awarding such further relief as the court deems just and proper.

## FOURTEENTH CAUSE OF ACTION

### (Violation of Florida's Deceptive and Unfair Practices Act

### (Injunctive Relief)

256.  Cox incorporates by reference paragraphs 1 through 166 as if set forth herein.

257.  Cox is an Interested Party as defined in Fla. Stat. § 501.203(6).

258.  Warner Bros. is engaged in "Trade" or "Commerce" as defined in § 501.203(8), Florida Statutes.

259.  Warner Bros.' conduct described above is deceptive and unfair and likely to mislead consumers.

260.  Section 501.203(8), Florida Statutes permits injunctive relief against a party who has violated, is violating, or is otherwise likely to violate Chapter 501, Florida Statutes.

261.   Cox will be irreparably harmed if Warner is not enjoined fro advertising or promoting War Dogs as Diveroli's true story.

262.   Cox does not have an adequate remedy at law.

264.   Cox is substantially likely to succeed on the merits of its claims.

WHEREFORE, Plaintiff, Matthew Cox, respectfully requests that the court enter an Order permanently enjoining Warner Bros. and all those acting in concert with Warner, or as its officers, servants, employees, attorneys, affiliates, subsidiaries. agents or representatives:

(a) advertising or promoting War Dogs as a "true story;" and

(B) for such further relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION

### (Violation of Section 43(a) of the Lanham Act)

265.   Cox incorporates by reference and alleges paragraph 1 through 166 as if set forth herein.

266.   Cox and Warner Bros. are competitors for purposes of marketing Diveroli's story.  Cox tells the true story in "Once A Gun Runner," while Warner purports to tell the true story in War Dogs.

267.   Warner Bros. in connection with marketing and sale of War Dogs, has made and continues to make false and/or misleading representations of act in commercial advertising used interstate commerce.

268.   Warner's representations deceive or are likely to deceive consumers.

269.   Warner's conduct constitutes false advertising in violation of § 43(a)(1)(B) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B).

270.   Warner's representations have caused and are likely to continue causing Cox competitive or commercial injury, including, but not limited to, loss of goodwill, loss of sales, and loss of professional credibility.

WHEREFORE, Plaintiff, Matthew Cox, demands judgment against Warner Bros. for damages, special damages including lost profits, treble damages, recovery of Warner's profits, interest, cost, and for such further relief the court deems just and proper.

### SIXTEENTH CAUSE OF ACTION

#### (Unfair Competition)

##### (Damages)

271.   Cox incorporates by reference and alleges paragraph 1 through 166 as if set forth herein.

272.   Cox and Warner Bros. are competitors for purposes of marketing Diveroli's story -- they compete for a common pool of customers.  Cox tells the true story in Once A Gun Runner, while Warner purports to tell the true story in War Dogs.

273.   Warner's conduct, as set forth above, is used in commercial advertising or promotion of false and/or misleading representations of fact.

274. These false and/or misleading descriptions of fact actually deceive or tend to deceive a substantial number of consumers and were material to consumers' purchasing decisions.  In addition, these false and/or misleading representations of fact continue to actually deceive or tend to deceive a substantial number of consumers and continue to be material to consumers' purchasing decisions.

275. Warner's act of false advertising were intended to cause and did in fact cause deception of the public, misleading prospective purchasers as to the truth of the story presented in War Dogs.

276. As a result of warner's false advertising and unfair competition, Cox has suffered damages, including, but not limited to, loss of goodwill, loss of sales, and loss of professional credibility.

WHEREFORE, Counter-Plaintiff/Defendant, Matthew Cox, demands judgment against Warner Bros. Pictures, Incarcerated Entertainment, LLC, Efraim Diveroli, and the Estate of Ross Reback, for damages, special damages including lost profits, recovery of warner's profits, interest, costs and for such further relief the court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff/Defendant, Matthew Cox, respectfully requests that the Court enter an Order:

1. Declaring that the copyright to the "Once A Gun Runner" manuscript is owned by Mr. Cox within the meaning of the U.S. Copyright Act.

76.

**Warner Bros. Pictures**

2. Permanently enjoining Warner Bros. and all those acting in concert with Warner, including its officers, servants, employees, attorneys, affiliates, subsidiaries, agents or representatives, from advertising or promoting War Dogs as a "true story."

3. Requiring Warner Bros. to take corrective action to disabuse the public of the false notion that "War Dogs" is a true story.

4. Awarding Cox damages, special damages, including lost profits, treble damages, recovery of Warner's profits, interest, costs, and for such further relief the court deems just and proper.

5. Awarding Cox his pre-judgment, post-judgment and monetary interest as provided by law.

6. Awarding Cox exemplary, punitive or treble damages as provided by law.

7. Awarding Cox prevailing party fees and related costs in this action.

8. Awarding Cox such other and further relief as the court deems appropriate.

**Incarcerated Entertainment/Efraim Diveroli/Reback Estate**

9. Awarding Cox his pre-judgment, post-judgment and monetary interest as provided by law.

10. Awarding Cox exemplary, punitive or treble damages as provided by law.

11.  Awarding Cox prevailing party attorney fees and related costs in this action.

12.  Awarding Cox such other and further relief as the court deems appropriate.

Dated:  June 21, 2018


                              Respectfully submitted,



                              Matthew B. Cox
                              Register No. 40171-018
                              Federal Correctional Complex
                              P.O. Box 1031
                              Coleman, Fl 33521

78.

TRULINCS  40171018 - COX, MATTHEW BEVAN - Unit: COL-B-D

--------------------------------------------------------------------------------

FROM: 40171018
TO:
SUBJECT: Diveroll
DATE: 02/01/2016 01:21:57 PM


Efraim,

I understand there have been some delays and road blocks on the publishing and the series front. For obvious reasons I haven't said much, because of my position and role in the creation of "Once A Gun Runner...". However, I think you guys have come to a point were someone needs to cut through all the crap and point out the obvious.

BACKGROUND: You and Ross have approached all the big publishing houses and they've all passed; due to Guy Lawson's soon-to-be-released book by Simon & Schuster and the current Warner Brothers' movie.

As a result of Jonah Hill's involvement, Universal has put the deal for a series based on "Once A Gun Runner..." on hold; unless it can be sold to a third party. In my humble opinion, that'll most likely be the opinion of the remaining studios. You're dead in the water on those fronts.

HERE IS WHERE THINGS STAND: Suing Warner Brothers and Simon & Schuster isn't going to work; they haven't done anything wrong and you're not going to be able to get them to not publish/produce their version of the story. It's a waist of time and money.

Stop focusing on what everyone else is doing and start focusing on what you should be doing. You have an amazing story and memoir!!!

THE FOLLOWING--IN MY OPINION--IS THE ONLY VIABLE COURSE OF ACTION: E-publish/self publish the memoir with Xlibris, hire a publicist and a professional blogger, do a press release, buy opt-in list, banner ads, social media advertising, linked ads, and do an interview with the New York Times, Variety, The Hollywood Reporter, etc. Once there's some buzz call Howard Stern; I'm sure a show like his would love to hear all about how Guy Lawson wrote an INACCURATE article for Rolling Stone, that was bought by Warner Brothers and Todd Phillips, and is now being made into a movie starring Jonah Hill; and one of their lead characters was recently arrested for MALE PROSTITUTION! Also, Simon & Schuster is about to come out with an equally INACCURATE book. Those are HUGE talking points.

The above should, and I believe will, create enough publicity that Universal might jump back on the bandwagon. It also might cause you to get offers from Sony, MGM, or one of the other studios. If nothing else, it'll cause an increase of sales of the memoir, and will most likely lead to a deal with Random House, Penguin, etc.

While you and Ross are talking to lawyers and chasing deals your missing a major opportunity. Everyone loves the story and the memoir.

HERE ARE THE PROS: Beating Lawson out of the gate gets your version out in front and it looks like he's following you--it might even cause Simon & Schuster to push his publishing date back again. It also, might cause Todd Phillips to rethink his version of the story, and cause interest in a series. As of right now, NO-ONE knows your version of the story. Publish it!

HERE ARE THE CONS: Nothing else is moving forward, so there aren't any cons! However, if your memoir comes out after Lawson, it'll look like sour grapes.

Efraim, I didn't sign up to NOT have your memoir published. I wrote a damn good manuscript and I believe in the story. Publish it and push it. It's your only real option. Stop fucking around and get to work on the opportunity you have sitting in front of you. It's the fastest, best solution; and if it's done right, it'll fix all the problems that WAITING to pitch the project caused.

ON AN UNRELATED TOPIC: When we first met, I didn't like you; you were arrogant and rude. When we first started writing the outline, my opinion of you didn't change much. However, by the time we were finished with the manuscript, I thought you were one of the best people I'd met, not just in prison, but EVER. You were fearless and you said exactly what you thought, and I respected that. You were smart, funny, and genuine. When you left 00085

TRULINCS 40171018 - COX, MATTHEW BEVAN - Unit: COL-B-D

-----------------------------------------------------------------------------------------

you gave me a big bear hug, and a speech about the two of us being friends and you not forgetting your friends.

The day after you left, Turk made a crack about never hearing from you again; and I looked at him and said, "You don't know him, Turk. I wouldn't be surprised if Efraim picked me up at the fucking door."

Then, when you and Ross were trying to get me to let you pay for an attorney for my Rule 35 hearing, I was even more certain you and I would remain friends. Every time you and Ross talked, he told me you asked how I was doing, and how much you liked and valued me as a friend.

However, since you've been released, you've refused two CORLINKS requests; you've never dropped me a letter asking if I needed anything, or told Ross to have me write you, or to call you. And don't give me that SHIT about not associating with felons. I'm currently emailing two people in the halfway house and three guys on supervised release—no one gives a shit!

Oh yeah, if I'm coming off bitter and angry. It's because I am. What's your fucking problem? Did your priorities really change that much? I'm rooting for you, Efraim. But I don't believe I'll be seeing you at the gate anymore.

FINALLY (this letter went much longer than I'd anticipated--sorry), IN CLOSING: Waiting is what has gotten you, Ross, and me, into this position; decisive action is the only thing that can get us out of it. Stop listening to the lawyers, they're trained to find problems not solutions. Ross, is one of the most honest and trustworthy people I've ever met; and I've met a lot of people. Get together with him and follow the above plan. There aren't any others.

Call Xlibris and get the project moving forward, it needs to be edited. Then start pushing it. Once you've proved the memoir has value everything else will fall into place. Not acting immediately is a mistake. Get moving, beat Lawson and get the REAL story out there. Advertise and hit media outlets.

Your paranoia and fear of making a wrong choice has made the project stagnant. Start moving! Xlibris might not be as sexy and glamorous as a big publishing deal, but if you guys do it right, it'll get you there. People with far less have made it work. You could be the next "Orange is the New Black," the new "Wool," or "Fifty Shades of Grey." The new "I hope they sell Beer in Hell." The perfect million dollar deal isn't out there. You have to make it happen. You have an amazing story!!! Get moving!!!

Best,

Matthew

CC: Ross Reback

IE 0096

# THE REAL STORY BEHIND WAR DOGS

## The characters who inspired the movie are still fighting almost a decade after their infamous case.

### BY TIM ELFRINK



**Customers Who Watched This Item Also Watched**

verizon√

Wireless   Residential/Business   Document 98-2   Filed 12/31/18   Page 20f M 2 Pages   Stores Location   Español   Sign In/Register

Shop   My Verizon   Support   Watch Fios

Watch Fios   Live TV   Shows   Movies   Networks   Pay Per View   TV Listings & DVR

War Dogs (2016)

2016 · 114 mins · R  Rotten Tomatoes ® Score   56%

WAR DOG (2016) - "The true story of two young men, David Packouz and Efraim Diveroli, who won a $300 million contract from the Pentagon to arm America's allies in Afghanistan. Stars Jonah Hill, Miles Teller. (CC)"

Rent or Buy        Add Bookmark

Residential

cox

Home    Movies    TV Shows    Sports & Events    Premiums    Music    How to Watch

Shop    My Account    My Connection    Support

Contact



# War Dogs

**Available Now | R**

Same Day As DVD | 48 Hour Rental | Before Netflix™ and Redbox™

**Rotten Tomatoes® Scores:**

🍅 59%   🎬 71%

**Starring:** Jonah Hill, Miles Teller

The true story of two young men, David Packouz and Efraim Diveroli, who won a $300 million contract from the Pentagon to arm America's allies in Afghanistan.

**Watch Now**

1. Go to Channel 1 or Press the On Demand button
2. Select "All New Movies"
3. Scroll to select "See Full Listing of Titles"
4. Select "Buy Now"

WAR DOGS: © Warner Bros. Entertainment Inc. and Ratpac-Dune Entertainment LLC.



## iNDEMAND

### ORDERING INFORMATION

On Demand movies, live Pay-Per-View events and other programs are available to order with your cable remote.

Live event may be available to order on demand the following day.

Visit your provider's website for schedules and ordering information.

✉ **Sign up to receive weekly e-mails.**

Case 8:16-cv-01302-MSS-AAS   Document 117   Filed 05/17/17   Page 1 of 18 PageID 2843

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INCARCERATED ENTERTAINMENT, LLC,

 Plaintiff,

v.

WARNER BROS. PICTURES, a division of WB Studio Enterprises, Inc.,

 Defendant.

Case No: 8:16-cv-1302-T-35AAS

## ORDER

THIS CAUSE comes before the Court for consideration of Defendant Warner Bros. Picture's Motion to Dismiss (Dkt. 89), to which Plaintiff Incarcerated Entertainment, LLC has responded in opposition (Dkt. 99). Defendant submits twenty-two exhibits in support of its motion to dismiss (Dkts. 90, 91), to which Plaintiff has filed a response in partial opposition (Dkt. 97). Plaintiff submits four exhibits in support of its response in opposition (Dkt. 98), to which Defendant objects (Dkt. 100). Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court DENIES the motion to dismiss.

**I. BACKGROUND**

According to the Amended Complaint, Plaintiff Incarcerated Entertainment, LLC owns the rights to the life story of Efraim Diveroli. (Dkt. 78 at ¶ 3) In this action, Plaintiff sues Defendant Warner Bros. Pictures ("Warner") for false advertising and unfair competition, based on Warner's promotion of the movie *War Dogs* as the "true story" of Diveroli's path to becoming an international arms dealer.

1

Case 8:16-cv-01302-MSS-AAS   Document 117   Filed 05/17/17   Page 2 of 18 PageID 2844

As alleged, at age 18, Diveroli started a small business specializing in arms, ammunition trading, and bidding on U.S. Government defense contracts. (Id. at ¶ 12) By 2007, Diveroli's company, AEY, Inc., outbid established defense contractors Northrop Grumman and Lockheed Martin and was awarded a $298 million contract to supply arms and ammunition to support the United States' war effort in Afghanistan. (Id. at ¶¶ 14-15) Diveroli relied on select lower-level employees to assist his business, including David Packouz, a neighborhood acquaintance. (Id. at ¶ 15)

In March 2008, the U.S. Government suspended AEY Inc.'s contracts based on allegations that the company had violated pre-existing arms embargos. (Id. at ¶ 16) At age 22, Diveroli was indicted by a federal grand jury in Miami and ultimately accepted a four-year plea deal. (Id. at ¶¶ 16-17) Diveroli's associate, Packouz, was sentenced to house arrest. (Id. at ¶ 22)

During his incarceration, Diveroli was contacted by Guy Lawson, a well-known journalist and author who wanted to write an article about Diveroli's story. (Id. at ¶ 19) In March 2011, *Rolling Stone* magazine published Lawson's article, *The Stoner Arms Dealers: How Two American Kids Became Big-Time Weapons Traders*. (Id. at ¶ 22) The article featured accounts by both Diveroli and Packouz. (Id.) In August 2011, Lawson optioned the movie rights for the article to Warner. (Id. at ¶¶ 23-24) Lawson later expanded the article into a book, *Arms and the Dudes*. (Id. at ¶ 42)

By February 2014, Diveroli's own manuscript, *Once a Gun Runner*, was sufficiently complete for Plaintiff to market the movie rights. (Id. at ¶¶ 29-30) Diveroli's business partner, Ross Reback, contacted a number of producers and studios, including Warner, (Id. at ¶¶ 31-33) Although Warner considered the proposal, Warner eventually declined

2

to pursue a consulting arrangement with Diveroli. (Id. at ¶¶ 34-35). Instead, Warner retained David Packouz as a consultant and enlisted Guy Lawson as a producer. (Id. at ¶¶ 41-44).

The gravamen of the Amended Complaint is that Warner grossed more than $85 million by promoting War Dogs as Diveroli's "true story" when it was not the true story. (Id. at ¶¶ 1-2, 78) As the owner of the rights to Diveroli's story, Plaintiff alleges that it has been effectively shut out of the marketplace because consumers are more likely to purchase a ticket to War Dogs than to purchase Diveroli's memoir, Once a Gun Runner. (Id. at ¶¶ 3, 72, 75)

The Amended Complaint identifies a number of allegedly false advertisements, including statements in movie trailers, social media posts, and promotional interviews with War Dogs' director, Todd Phillips, screenwriter Stephen Chin, and stars Jonah Hill, Miles Teller, and Bradley Cooper. (Id. at ¶¶ 49-70) For instance, Jonah Hill stated that War Dogs is "one of the craziest movies I've ever been in – in a great way. And it's all true." (Id. at ¶ 67) Miles Teller told interviewers on multiple occasions, "these are real people" and "real guys who are still alive." (Id. at ¶ 59) Stephen Chin stated that he wanted to be "deeply true to their story." (Id. at ¶ 62) Todd Phillips explained that "we certainly tried to follow what happened as closely as possible I think. If you know the story at all, we pretty much stick to the facts as much as we can." (Id. at ¶ 65)

In Counts I and III of the Amended Complaint, Plaintiff asserts violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which creates a civil cause of action against "[a]ny person who . . . uses in commerce any . . . false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature,

3

characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." In Counts II and IV, Plaintiff brings state-law claims for unfair competition pursuant to Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.204(1), which prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

In the instant motion to dismiss, Warner argues that the challenged statements are not actionable because they include protected artistic or political speech under the First Amendment. In the alternative, Warner argues that the Amended Complaint fails to allege the necessary facts in support of Plaintiff's claims. With the limited exceptions outlined below, the Court holds that Plaintiff states plausible claims for relief.

II.   STANDARD

The threshold for surviving a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is a low one. Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al., 711 F.2d 989, 995 (11th Cir. 1983). A plaintiff must plead only sufficient facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-62 (2007). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to provide the "grounds" for his entitlement to relief. Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1364 (S.D. Fla. 2007) (quoting Twombly, 550 U.S. at 555). In evaluating the sufficiency of a complaint in light of a motion to dismiss, the well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994-95.

4

Warner briefly asserts that Plaintiff's claims must be pleaded with specificity under Fed. R. Civ. P. 9(b) because the claims are "grounded in fraud." (Dkt. 89 at 9). In the Eleventh Circuit, the weight of authority holds that a Lanham Act claim for false advertising and a state-law claim for unfair competition need not be pleaded with specificity. USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC, No. 15-CIV-80352-BLOOM/Valle, 2016 WL 4254257, at *2 (S.D. Fla. Feb. 16, 2016); Wika Instrument, L.P. v. Ashcroft, Inc., No. 1:13-CV-43-CAP, 2013 WL 12061904, at *2 (N.D. Ga. July 3, 2013); Third Party Verification, Inc. v. Signaturelink, Inc., 492 F. Supp. 2d 1314, 1327 (M.D. Fla. 2007). Consistent with this authority, the Court declines to impose a heightened pleading requirement.

Courts are split on the question of whether a FDUTPA claim must meet Rule 9(b) pleading requirements. See Fineman v. Marriot Vacations Worldwide Corp., No. 3:14-CV-1154-J-32MCR, 2015 WL 5440611, at *2 (M.D. Fla. Sept. 15, 2015). Even assuming that Rule 9(b) applies, the Amended Complaint adequately alerts Warner to the "precise misconduct with which [it is] charged." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted). Indeed, in connection with the motion to dismiss, Warner has compiled and submitted to the Court the original sources for the challenged statements. (Dkts. 90, 91). The Court therefore assesses the Amended Complaint under a notice-pleading standard.

III. DISCUSSION

The parties analyze the Lanham Act claims and state-law claims under the same rubric, consistent with Eleventh Circuit law. (Dkt. 89 at 11 n.4, 23; Dkt. 98); Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers, 702 F.3d 1279, 1296 (11th Cir. 2012) (noting that the success of state-law unfair competition and FDUTPA claims

was tied to Lanham Act claim for false advertising); Natl Answers, Inc. v. SmithKline Beecham Corp., 529 F.3d 1325, 1333 (11th Cir. 2008). Accordingly, for purposes of the instant motion, the Court applies the framework of the Lanham Act.

A.   Commercial Speech

The Lanham Act prohibits false advertising in connection with "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B) (emphasis added). The Eleventh Circuit defines "commercial advertising or promotion" as encompassing four elements:

(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) the representations . . . must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

Edward Lewis Tobinick, MD v. Novella, 848 F.3d 935, 950 (11th Cir. 2017) (internal quotation marks and brackets omitted).[1] The parties dispute whether Plaintiff sufficiently alleges the first element of "commercial speech," which is a threshold requirement for liability under the Lanham Act. See Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1120 (8th Cir. 1999).

The concept of commercial speech under the First Amendment mirrors the commercial speech doctrine under the Lanham Act. Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1274 (10th Cir. 2000); see also Osmose, Inc. v. Vianca, LLC, 612 F.3d 1298, 1323 (11th Cir. 2010). The "core notion" of commercial speech encompasses "speech that propose[s] a commercial transaction." Edward Lewis Tobinick, MD, 848 F.3d at 950.

[1] In Tobinick, the district court questioned whether the second prong of this test remains good law, in light of the Supreme Court's decision in Lexmark International, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377 (2014), which held that a downstream supplier is authorized to sue under 15 U.S.C. § 1125(a)(1)(B). See Tobinick v. Novella, No. 9:14-CV-80781, 2015 WL 1191287, at *5 n.10 (S.D. Fla. Mar. 16, 2015). The application of Lexmark is discussed in Section B.3 below.

Even if a communication falls outside "core" commercial speech, the Supreme Court clarified in Bolger v. Youngs Drug Products Corp. that the communication may still be considered commercial if: (1) the communication is an advertisement, (2) the communication makes reference to a specific product, and (3) the speaker has an economic motivation for the communication. 463 U.S. 60, 66-67 (1983).

In a recent decision, the Eleventh Circuit applied the Bolger factors to assess whether challenged communications were "commercial speech" for the purposes of a false-advertising claim under the Lanham Act. Edward Lewis Tobinick, MD, 848 F.3d at 950-51 (addressing issue at summary judgment). Consistent with Bolger, the Eleventh Circuit explained that no single factor is dispositive, but the presence of all factors "provides strong support for the . . . conclusion that the [material is] properly characterized as commercial speech." Id. at 950 (quoting Bolger, 463 U.S. at 62, 67).

Applying the Bolger factors here, the Amended Complaint plausibly alleges that the challenged communications are "commercial speech." As to the first factor, the Amended Complaint alleges—and Warner concedes in the motion to dismiss (Dkt. 89 at 10-11)—that the challenged statements were used for promotional purposes. (See Dkt. 78 at ¶ 50.) As to the second factor, the Amended Complaint alleges that the challenged communications refer to a specific product, the movie War Dogs. (Id. at ¶¶ 51, 59, 60, 62, 63, 65-70; Dkts. 91-15, 91-16, 91-17, 91-18, 91-20, 91-21.) With respect to the third factor, the Amended Complaint alleges that Warner possessed an economic motivation for making the statements: Warner knew that representing the story as "true" would induce consumers to see War Dogs. (Id. at ¶¶ 68-71.)

Perhaps recognizing that its challenge fails under the Bolger test, Warner omits discussion of the relevant factors. (See Dkt. 89 at 9-11.) Instead, Warner proposes two bright-line rules. First, Warner contends that the promotions are "intertwined" with non-commercial speech, including political and artistic commentary, and therefore qualify as non-commercial speech. Second, Warner asserts that because the promotions relate to a movie, which is a protected expressive work, the communications are themselves protected.

Warner's second theory is unavailing. Although movies are works of artistic expression and must be protected, "they are also sold in the commercial marketplace like other more utilitarian products, making the danger of consumer deception a legitimate concern that warrants some government regulation." Rogers v. Grimaldi, 875 F.2d 994, 997 (2d Cir. 1989). Thus, the fact that an underlying work "is itself entitled to full First Amendment protection does not cloak all advertisements for the [work] with noncommercial status." Charles v. City of Los Angeles, 697 F.3d 1146, 1152 (9th Cir. 2012) (holding that a billboard advertising a television program was subject to the Lanham Act); see also Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 859 F. Supp. 1521, 1541 n.8 (S.D.N.Y. 1994) ("Of course, the fact that an advertisement promotes a good or service protected by the First Amendment does not serve by itself to remove the ad from the realm of commercial speech . . . ."). Tellingly, Warner cites no authority in support of its request for blanket protection for its speech.

Warner's primary theory is not amenable to resolution on this motion to dismiss. Warner asserts that because some of the promotions, such as interviews with the cast and crew of War Dogs, are "intertwined" with political or artistic commentary, the entire

promotion is exempt from regulation. In response, Plaintiff correctly points out that the case law requires a more nuanced analysis.

In Rogers, the Second Circuit addressed whether a Lanham Act claim could be based on a movie title, which the court observed "may be both an integral element of the filmmaker's expression as well as a significant means of marketing the film to the public," such that the artistic and commercial elements are "inextricably intertwined." 875 F.2d at 998. As a result, consumers "have a dual interest: They have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression." Id. In order to protect both interests, the Second Circuit adopted the following balancing test:

We believe that in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.

Id. at 999.

Courts typically apply the Rogers balancing test only to titles or to other expressive works. See Facenda v. N.F.L. Films, Inc. 542 F.3d 1007, 1015-16 (3d Cir. 2008) (citing cases); Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc., 886 F.2d 490, 495 (2d Cir. 1989) (holding that the Rogers balancing approach is generally applicable to Lanham Act claims against works of artistic expression"). Accordingly, in Facenda, the Third Circuit declined to apply the Rogers test to a "making of" documentary about a videogame. The Third Circuit explained that unlike a movie title or an expressive work, the documentary was intended "to promote another creative work, the video game."

Facenda, 542 F.3d at 1018. Because the documentary constituted "commercial speech" under the Bolger factors, the Third Circuit held that the documentary was actionable under the Lanham Act. Id.

Warner does not address whether the Rogers balancing test applies to the challenged movie trailers, social media posts, and interviews. For instance, Warner does not contend that the challenged communications are themselves artistic works, and the Amended Complaint at least plausibly alleges that, similar to the documentary in Facenda, the communications are separate promotions for War Dogs. As explained above, the Amended Complaint also plausibly alleges that the promotions are "commercial speech" under the Bolger factors.

Absent a more focused challenge and at this early stage in the litigation, Warner fails to call into question the plausibility of Plaintiff's allegations related to the threshold element of "commercial speech."[2] Warner may renew its arguments at a later stage.

**B.      False Advertising**

Warner next argues that the Amended Complaint fails to allege facts necessary to state a false advertising claim under the Lanham Act. To prevail on a claim for false advertising, a plaintiff must demonstrate that:

(1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising.

[2] Warner requested leave to file a reply to Plaintiff's response in opposition, arguing that it devoted only two pages of its brief to the First Amendment issues, while Plaintiff devoted ten pages to the subject. (Dkt. 100 at 2.) The omissions in Warner's motion to dismiss cannot be cured by a reply.

regarding the remaining elements are addressed below.

not currently dispute the fourth element, interstate commerce. Warner does

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004). Warner does

### 1.   False or misleading statement

The Lanham Act applies to two types of advertisements: (1) a statement that is

"literally false as a factual matter" and (2) a "misleading" statement that may be literally

true or ambiguous, but that "implicitly convey[s] a false impression, [is] misleading in

context, or [is] likely to deceive consumers." Id. at 1261 (quoting United Industries Corp.

v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998)); see also Johnson & Johnson Vision

Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002). To determine

whether an advertisement is false or misleading, a court "must analyze the message

conveyed in full context, and must view the face of the statement in its entirety." Osmose,

Inc. 612 F.3d at 1308 (internal quotation marks omitted). The court may not, however,

consider multiple advertisements in an advertising campaign as a whole, as that approach

assumes that consumers will be exposed to each advertisement. Johnson & Johnson

Vision Care, Inc., 299 F.3d at 1248 & n.4

The majority of Warner's arguments are not well-suited to a motion to dismiss.

With respect to the movie trailers, Warner contends that the phrase "based on a true

story" is not actionable because it conveys that the movie "is obviously fictionalized in

part." (Dkt. 89 at 12) The cases cited by Warner do not support such a clear-cut rule.[3]

---

[3] See Tyne v. Time Warner Entm't Co., L.P., 901 So. 2d 802, 810 (Fla. 2005) (holding that the term "commercial purpose" in Florida's commercial-misappropriation statute does not apply to motion pictures); Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 513 (1991) (in libel case, holding that factual issue existed as to whether a reasonable reader would understand quotations were a rhetorical device); Partington v. Bugliosi, 56 F.3d 1147, 1158 (9th Cir. 1995) (in libel case, explaining that a court must look at the specific content of statements to determine whether "a

but more notably, Warner fails to consider the entire trailer in context, including a realistic

news report by Wolf Blitzer, a well-known CNN anchor. (Dkt. 78 at ¶ 51) (citing

https://www.youtube.com/watch?v=RwH9c_E3dJk and https://www.youtube.com/watch?

v=KWoSqnZnhb). The Eleventh Circuit is clear that the court must view the face of the

statement in its entirety, rather than examining the eyes, nose, and mouth separately and

in isolation from each other." Johnson & Johnson Vision Care, Inc., 299 F.3d at 1248

(quoting Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 946 (3rd Cir. 1993)).

With respect to interviews by Jonah Hill, Miles Teller, Todd Phillips, and Stephen

Chin, Warner accurately insists that the challenged statements must be read in their full

context. (Dkt. 89 at 17-18; see Dkt. 78 at ¶¶ 59, 62, 65-70) But apart from advancing

that argument, Warner neglects to address the relevant question: whether the statements,

read in their full context, falsely or misleadingly portray War Dogs as a true story. Warner

implies that they do not, but that conclusion calls for a fact-intensive inquiry and that the

Court draw inferences in Warner's favor, neither of which is appropriate on a motion to

dismiss.

With respect to statements by journalist Guy Lawson and Diveroli's former

associate, David Packouz, Warner first argues that the Amended Complaint does not

establish that they made statements as agents of Warner. (Dkt. 89 at 14-15); see Procter

& Gamble Co. v. Haugen, 317 F.3d 1121, 1126 (10th Cir. 2003) (recognizing that the

Lanham Act incorporates common-law concepts of agency, apparent authority, and

vicarious liability). In pressing this argument, Warner fails to acknowledge that the

particular statement of opinion may imply a false assertion of objective fact"); Greenman v.

Random House, Inc., 859 F. Supp. 2d 206, 220 (D. Mass. 2012) (holding that book's designation

as "non-fiction" did not support a Lanham Act claim).

Amended Complaint alleges that Lawson was a producer of the movie, that Packouz was retained as a consultant and had a cameo in the movie, and that Lawson and Packouz made their statements as agents of Warner. (Dkt. 78 at ¶¶ 41, 43, 55, 79, 85-86). Given Packouz's status as a consultant and actor, and Lawson's status as a producer, an agency relationship with Warner may be plausibly inferred.

Warner further argues that statements by Packouz and Lawson are opinion or puffery. (Dkt. 89). Although "[s]tatements of opinion are generally not actionable under the Lanham Act," an opinion may be actionable "if it fairly implies a factual basis." Duty Free Americas, Inc. v. Estée Lauder Cos., Inc., 797 F.3d 1248, 1277 (11th Cir. 2015) (internal quotation marks and brackets omitted). According to the Amended Complaint, Lawson stated on his Facebook page that War Dogs was "amazingly close to the real truth of the story." (Dkt. 78 at ¶ 60) Lawson also previously announced on his Facebook page that War Dogs was inspired by his own book. (Id. at ¶ 55). Based on these allegations, a reasonable person could infer that Lawson knew the true story and his characterization of War Dogs "fairly implie[d] a factual basis." Duty Free Americas, Inc. 797 F.3d at 1277. Similarly, because Packouz identified himself as the subject of the movie, his statement that "this is exactly how it happened" at least arguably implies a factual basis. (Dkt. 78 at ¶ 63).

Warner more successfully challenges other discrete allegations in the Amended Complaint. Warner observes that allegations regarding the War Dogs website and the War Dogs Facebook page do not allege any false or misleading statement. (Dkt. 89 at 13, 16; see Dkt. 78 at ¶ 52) Warner contends that the publication of Diveroli's photograph in Rolling Stone is not actionable, absent some allegation that Warner controlled Rolling

Stone. (Dkt. 89 at 13; see Dkt. 78 at ¶ 54) Warner argues that a loosely-translated Argentinian Facebook post is not actionable, (Dkt. 89 at 16; see Dkt. 78 at ¶ 64). Warner maintains that Lawson's statements promoting his own book are not actionable because they do not promote War Dogs. (Dkt. 89 at 14; see Dkt. ¶¶ 55, 61) And Warner reports that [Plaintiff] has conceded to dropping [its] claim based on the War Dogs movie poster. (Dkt. 13-14; see Dkt. 78 at ¶ [__])

[Plaintiff] [disputes] none of these [points]. See generally Dkt. 89 at 13-15)

According to [____], [the] court finds that the allegations [in] paragraphs 52, 54, 55, 56, 61, and 64 of the Am[ended] complaint are not, in and [of] themselves, actionable. This finding, however, [does not] warrant the granting o[f the motion] to dismiss. With respect to the remaining [statements], Warner may renew [its arguments] in a proper dispositive motion.

**2. [_____] deception and m[ateriality]**

[W]arner contends that Plaintiff can only [survive a motion] to dismiss by identif[ying] specific statements and showing how the statement[s] [actually] deceived specific cons[umers]. (Dkt. 89 at 18-19) [In support of that argument], [Warner relies on] case law address[ing] Lanham Act claims on the merits, rather than on [a motion] to dismiss. (Dkt. 89 at 18-20); see Johnson & Johnson Vision Care, Inc., 29[_] [F.3d] at 1247-51 (addressing likelihood of success for preliminary injunction); Swatch [v.] New City, Inc., 454 F. Supp. 2d 1245, 1252-53 (S.D. Fla. 2006) (summary

judgment); Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 247 (3d Cir. 2011) (bench trial). Warner cites no authority to suggest that factual evidence of consumer deception is required at the pleading stage, and the Court declines to impose such an evidentiary burden. See Ameritox, Ltd v. Millennium Labs., Inc., 889 F. Supp. 2d 1304, 1316 (M.D. Fla. 2012) ("[A]lthough a party must support allegations of misleading advertisements with evidence of consumer deception at later stages of litigation, that burden does not exist at the pleading stage.").

A plaintiff may plead the "materiality" element by alleging that "the defendants misrepresented an inherent quality or characteristic of the product." Johnson & Johnson Vision Care, Inc., 299 F.3d at 1250 (quoting Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997)). Plaintiff pleads sufficient facts to support an inference that the truthfulness of War Dogs is an "inherent quality or characteristic." The Amended Complaint alleges that consumers are drawn to true stories and that a test screening for War Dogs revealed that one of the main things people liked was that it was based on a real story. (Dkt. 78 at ¶¶ 68, 70) Consistent with these allegations, Miles Teller stated, "I love the words 'based on a true story' at the beginning of a film . . . it buys you so much with an audience," and Todd Phillips stated "the idea that this was a true story was for me the most interesting part about it." (Id. at ¶¶ 68-69)

Warner also argues that Plaintiff fails to allege materiality because the movie accurately represents Diveroli as unethical and dangerous. (Dkt. 89 at 20-22) As an initial matter, Warner's argument that War Dogs is truthful portrayal is at least somewhat at odds with Warner's earlier insistence that the movie is a fictionalized account. (Dkt. 89 at 3, 7, 12) In any event, because Plaintiff is not alleging that scenes from the movie itself

were false or misleading, the accuracy of the movie is not relevant to the issue of materiality.

3. Zone of Interests and proximate causation

Warner next argues that the Amended Complaint omits the necessary allegations of injury and causation. (Dkt. 89 at 22-23) In Lexmark International, Inc. v. Static Control Components, Inc., the Supreme Court held that, in order to state a false-advertising claim under the Lanham Act, a plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising . . . ." 134 S. Ct. 1377, 1391 (2014). With respect to injury, the Amended Complaint alleges that Warner's advertising has caused "loss of goodwill" and "loss of sales." (Dkt. 78 at ¶ 113) Those allegations are similar to the allegations in Lexmark, and Warner cites no authority to support its contention that Plaintiff must allege in "detail" how its goodwill was damaged or how its sales declined. (Dkt. 89 at 22); Lexmark, 134 S. Ct. at 1393 (explaining that the counterclaimant's "alleged injuries – lost sales and damage to its business reputation – are injuries to precisely the sorts of commercial interests the [Lanham] Act protects").

Warner may instead seek discovery on the nature and extent of Plaintiff's damages. [With respect to causation, Lexmark instructs that the necessary showing is present when "deception of consumers causes them to withhold trade from the plaintiff." Lexmark, 134 S. Ct. at 1391. In contrast to the facts at issue in Lexmark, which involved a claim by a downstream supplier, Plaintiff alleges that it is a direct victim of Warner's advertising because War Dogs diverted book sales from Plaintiff. In particular, the Amended Complaint alleges that "consumers who desire to learn the true story are most likely to purchase a ticket to the movie, after being bombarded with promotional material, rather

than purchasing Diveroli's memoir.'" (Dkt. 78 at ¶ 75) Accordingly, Plaintiff plausibly alleges that its injuries "flow[] directly" from Warner's advertising. *Lexmark*, 134 S. Ct. at 1393. Again, whether Plaintiff will actually be able to prove its theory is a separate question that is not appropriate for resolution on a motion to dismiss.

### C. Florida's Anti-SLAPP Statute

At the conclusion of the motion to dismiss, Warner asserts that Plaintiff's complaint falls within Florida's anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, Fla. Stat. § 768.295. (Dkt. 89 at 24-25) As a result, Warner contends that "if and when" the Court grants its motion to dismiss, Warner will file a motion for an award of fees and costs. (*Id.* at 26); *see* Fla. Stat. § 768.295(4) ("The court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section.").

Currently, Warner does not appear to ask for any relief under the anti-SLAPP statute. For instance, Warner does not contend that resolution of this motion is evaluated under a summary-judgment standard and it does not request an expedited hearing. *See* Fla. Stat. § 768.295(4) (providing that a defendant may file a motion for summary judgment seeking a determination that the anti-SLAPP statute has been violated). The Court therefore declines to address the application of Fla. Stat. § 768.295 at this juncture. *Compare Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357-62 (11th Cir. 2014) (holding that verification requirement imposed by Georgia's anti-SLAPP statute did not apply in a diversity case), *and Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1337 n.5 (D.C. Cir. 2015) (holding that attorney's fees were not available under Washington D.C.'s anti-SLAPP statute), *with Edward Lewis Tobinick, MD*, 848 F.3d at 944-45 & n.8

(applying California's anti-SLAPP statute, which allowed a special motion to strike, where the appellants waived their challenge to its application in the district court), *and Addison v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (holding that mandatory fee shifting provision in Nevada's anti-SLAPP scheme applied in federal court).

### D. Consideration of Exhibits

Warner filed a separate request for the Court to consider twenty-two exhibits in support of its motion to dismiss, which are designated as Exhibits A through V. (Dkts. 90, 91) After the parties conferred, Warner withdrew its request as to Exhibits F through H, and Plaintiff stipulated to the Court's consideration of Exhibits A and N through V (Dkt. 96), which are referred to, excepted in, or attached to the Amended Complaint or original complaint, and which are central to Plaintiff's claims. (Dkt. 91 at ¶¶ 4, 17-25; Dkt. 78 at ¶¶ 29-30, 55, 60, 62-67, 70); *see Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (holding that documents may be considered on a Rule 12(b)(6) motion if they are undisputed and central to the plaintiff's claims).

The remaining exhibits—Exhibits B through E and I through M—include documents from Diveroli's criminal and civil cases, a U.S. Congressional committee report about Diveroli's company, and a related news article. (*See* Dkt. 91 at ¶¶ 5-8, 12-16) Although Warner asserts that these exhibits are relevant to Diveroli's "misconduct and notoriety" (Dkt. 90 at 5), the Court declines to consider the documents because Diveroli's misconduct and notoriety are not relevant to the motion to dismiss.

For its part, Plaintiff submits screenshots from four websites that offer movies on-demand and in which *War Dogs* is described as a "true story." (Dkt. 98) Plaintiff contends that these descriptions were "located after filing the Amended Complaint," and that they

underscore why its claims should not be dismissed. (Dkt. 99 at 3-4) Warner objects to the submission of the screenshots because, among other things, the statements on the websites are not challenged in the Amended Complaint. (Dkt. 100 at 1) The Court determines that the screenshot exhibits should not be considered in the resolution of the motion to dismiss.

IV.   CONCLUSION

Based on the foregoing, it is ORDERED that Defendant's Motion to Dismiss (Dkt. 89) is DENIED.

DONE and ORDERED in Tampa, Florida, this 10th day of May, 2017.

MARK S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Any Unrepresented Person

19

This envelope is made from post-consumer waste. Please recycle - again.

UNITED STATES
POSTAL SERVICE ®

★ M A I L ★

U.S. POSTAGE
COLEMAN, FL
33521
JUN 19, 2018
AMOUNT
$0.00
R2305H127076-12

1006

33128

▦ DATE OF DELIVERY SPECIFIED*

🛜 USPS TRACKING™ INCLUDED*

$ INSURANCE INCLUDED*

📦 PICKUP AVAILABLE

* Domestic only

9114 9012 3080 1329 6182 35

USPS TRACKING #

USPS TRACKING*

P S 0 0 0 0 1 0 0 0 0 1 4

EP14F July 2013
OD: 12.5 x 9.5

Label 400  Jan. 2013
7690-16-000-7946

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

WHEN
A
LA

UNITED STATES
POSTAL SERVICE.

FROM:
Matthew Cox, 40171-018
Federal Correctional Complex-Low
P.O. Box 1031
Coleman, FL 33521

TO: Clerk of Court
U.S. District Court
For the Southern District of Florida
400 N. Miami Ave., Room 8N09
Miami, FL 33128-7716